UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SCANMAR AS, a Norwegian        )
corporation,                   )
                    Petitioner,)
                               )
    vs.                        )   CAUSE NO.
                               )
HYDRA-PRO, INC., a Washington  )
corporation,                   )   PETITION TO CONFIRM
                               )   FOREIGN ARBITRATION AWARD
                    Respondent.)
_____)

    Petitioner Scanmar AS, a Norwegian corporation, states and
alleges as follows:


                         **I. PARTIES**


    1.1 Petitioner Scanmar AS ["Scanmar"] is a corporation
duly organized and existing under the laws of the Kingdom of
Norway, with its principal place of business located at
Asgardstard, Norway.

1

John S. Congalton (WSBA #6584)
Attorney-at-Law
6277-79th Ave. SE
Mercer Island, WA 98040
Phone: 206-623-8300

1.2 Respondent Hydra-Pro. Inc. ["HPSEA"] is a corporation duly organized and existing under the laws of the State of Washington, with its principal place of business located at Seattle, Washington.

## II. JURISDICTION

2.1 Norway is a party to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958.

2.2 This proceeding arises under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, and under Chapter 2 of Title 9, United States Code, (9 U.S.C. Section 201-208). The jurisdiction of this case arises under 9 U.S.C. Section 203.

## III. CLAIM FOR RELIEF

3.1 Scanmar entered into a written Distributorship Agreement with HPSEA in November 2004 regarding the purchase and sale of Scanmar's products [fish catch control systems] in a defined territory including Washington, Alaska, Oregon and California. A certified copy of the Distribution Agreement is attached hereto as Exhibit "A."

Scanmar's Petition

John S. Congalton (WSBA #6584)
Attorney-at-Law
6277-79th[th]Ave. SE
Mercer Island, WA 98040
Phone: 206-623-8300

3.2 In the Distributorship Agreement, section 6, it is agreed that all disputes between the parties will be decided according to the Rules of the Arbitration Institute of the Oslo Chamber of Commerce. The number of Arbitrators shall be (1), and the Arbitration Court shall be set in Oslo and be held in the English language.

3.3 A dispute between the parties arose as a consequence of defaults in payment by HPSEA under the Distributorship Agreement.

3.4 The parties proceeded to arbitration before the Arbitration Court in Norway. The arbitration and all proceedings were in accordance with the laws of Norway and the parties' agreement.

3.5 On June 8-10, 2010, a hearing was held at Oslo, Norway, before the Arbitration Court of the Oslo Chamber of Commerce. Attorney Gunnar Stake-Larsen nominated jointly by the parties acted as sole Arbitrator. Both parties appeared and participated.

3.6 On July 8, 2010, the Arbitrator, after consideration of the evidence presented at the hearing, made his final and

Scanmar's Petition

John S. Congalton (WSBA #6584)
Attorney-at-Law
6277-79th Ave. SE
Mercer Island, WA 98040
Phone: 206-623-8300

fully enforceable Award in favor of Scanmar, in writing, and delivered it to the parties. A certified copy of the Award, consisting of 36 pages, is attached as Exhibit "B."

3.7 Since the date of the Award, Scanmar has demanded payment from HPSEA in accordance with the Award. A copy of Scanmar's written demand for payment of the Award, including interest is attached as Exhibit "C." HPSEA has failed to pay. Accordingly, Scanmar brings this action to confirm the Award.

## IV. PRAYER FOR RELIEF

WHEREFORE, petitioner Scanmar AS, a Norwegian corporation, prays for the following relief over and against respondent Hydra-Pro., Inc., a Washington corporation:

(1) for confirmation of the foreign arbitration award as against respondent and in the amounts appearing in Exhibit "C;"

(2) for entry of judgment over and against respondent in conformance with the foreign arbitration award as in subparagraph (1), and all sums to be converted into U.S. dollars, according to the exchange rate established by the Federal Reserve of the United States;

4

Scanmar's Petition

John S. Congalton (WSBA #6584)
Attorney-at-Law
6277-79th Ave. SE
Mercer Island, WA 98040
Phone: 206-623-8300

(3)  for prejudgment interest at the highest rate allowed by law

as in subparagraph (1) through date of entry of judgment,

and post-judgment interest thereafter at like rate;

(4)  for an award of costs and attorneys' fees as may  allowed

by law;

(5)  for such other and further relief as the Court may deem

just and equitable.

DATED this **23ʳᵈ** day of July 2010.

*John S. Congalton*
John S. Congalton (WSBA #6584)
Attorney-at-Law
Attorney for Petitioner
6277-79th Ave. SE
Mercer Island, WA 98040
Phone: 206-623-8300
Fax: 206-275-1860
E: JohnCongalton@aol.com

5

Scanmar's Petition

# EXHIBIT "A"

Confidential                    Page 1                         1 : 2 : :

# DISTRIBUTORSHIP AGREEMENT

# CERTIFIED COPY

Anne Kieding Presthus
advokat    Oslo 16 July 2010

Draft

# DISTRIBUTORSHIP AGREEMENT

## Scanmar AS
## P.O. Box 44
## N-3167 Åsgårdstrand
## Norway

Hereinafter called **"the Manufacturer"**,

Grants to

## Hydra Pro Inc.
## 4259  22nd Avenue W
## Seattle, WA 98199
## USA

Hereinafter called **"the Distributor"**,

The right to sell in **Washington, Alaska, Oregon and California**
Hereinafter called **"the Territory"**,

**Scanmar Catch Control Systems** including spare parts,
hereinafter called **"the Product"**.
The ScanCatch & MiniCatch systems are not included in this agreement.

2

## 1.    DUTIES OF THE DISTRIBUTOR

### 1.1    Legal Status of the Distributor

The Distributor buys and sells in his own name and for his own account to the fishing fleet in the Territory and to local shipyards for vessels being built for the Territory. The Distributor also has the right to sell supplementary products to fishery research vessels in the Territory, while the Manufacturer shall handle new buildings for fishery research based on information from the Distributor. He shall effectively promote the sale of the Product in the Territory, and shall safeguard the interest of the Manufacturer with the due diligence of a responsible businessman. For vessels built in the territory for 3rd nation, the Distributor shall inform Manufacturer, so that Manufacturer will decide about split commission as described in 2.1. The Distributor shall under no circumstances sell Scanmar Products, new or second hand outside Territory.

### 1.2    Sales Organisation, Service and Stock

The Distributor shall at all times have an efficient and competent sales and after sales organisation in the Territory for sales promotion and service of the Product. Local dealers shall be appointed in main ports to be able to provide first line service and sales, change of dealers shall be approved by Manufacturer. Educating and training of the dealer is the responsibility of the Distributor.

The Distributor shall maintain a minimum stock of complete units, to cover at least sales and warranty replacement for the forthcoming month, as agreed to in annex 1. Further he shall hold an adequate stock of spare parts to enable prompt repair and deliveries to customers within the Territory.  An inventory shall be reported at the end of each year.

The Distributor shall have necessary equipment and trained people for service and repair.

The Manufacturer retains the right to market and sell by itself the Product in case of negligence or incapacity on the part of the Distributor, i.e. on the occasion of loss of key personnel and/or lack of promotional activities.

### 1.3    Prices and conditions of sales and supply

The Distributor buys the Product at prices and terms given by the Manufacturer.

The Distributor is obliged to supply name of vessel and owner of vessel when ordering the Product from the Manufacturer, unless Products are ordered for stock, then it is subject to paragraph 1.4.5

The Distributor is obliged to supply the Manufacturer with retail prices and margins given to dealers in the Territory as part of budget and market plans each year.

The Manufacturer's General Conditions of Sales and Delivery, the currently applicable version of which is attached to this Contract by Annex II, shall govern sales of the

3

Product to the Distributor, unless special conditions are granted in separated attached annexes.

1.4  Budgets, Reporting and Market Information
The Distributor shall keep the Manufacturer informed of his activities as well as of the market conditions within the Territory.

1.4.1  Before the 10ᵗʰ of October of each calendar year, the Distributor and the Manufacturer shall agree upon sales budget and market activities in the Territory for the forthcoming year. Final agreement shall be made in a meeting at the Manufacturer premises, unless else agreed.

1.4.2  The Distributor shall send to the Manufacturer a report of the development of the fishing industry in the Territory containing; economy, new buildings, rebuilding, sales / purchase of second hand vessel and information about owners/fishing companies, management companies, shipyards and Ship consultants quarterly or when required.

1.4.3  The Distributor shall send the Manufacturer by the end of each Month a brief report of marketing activities performed, and a plan for the following 3 months.

1.4.4  The Distributor shall inform the Manufacturer of vessels that; are sold, sold out of country, have changed name.

1.4.5  All sales of the Product from local stock shall be reported at least once a month using template per annex III.

1.4.6  All sales of second-hand Products within the Territory by the Distributor have to be reported consecutively using template in annex III

1.5  Marketing

The Distributor shall at his own expense undertake appropriate marketing activities, such as advertising, participation in fairs, and distribution of promotional material and documentation as agreed in budget and marketing plan (annex IV).

1.5.1  The Distributor shall at his own expense, undertake translation of  Scanmar Info, Direct Mails (DM) and other relevant documentation provided by the Manufacturer and adapt it to the needs of the local market.

1.5.2  The Distributor shall participate in sea trials for training, installation and demonstration and provide the Manufacturer with user experiences, Pictures and statement from the local fishing fleet.

1.5.3   The Distributor shall actively use Scanmar Info and DM (direct mail) and other promotional material in his sales and marketing work. The Distributor shall contribute with articles and user benefits from his local market to Scanmar Info and DM on request, and translate articles for local distribution.

1.6   Official Approval
The Distributor shall at his own expense urgently undertake to obtain the necessary official approvals for use of the Product including all necessary certification and registrations. The Manufacturer shall provide necessary technical specifications at the Distributor's request, provided the information is not considered to be of a secretive nature

1.7   Fair Competition
The Distributor shall purchase the Product only from the Manufacturer. He shall not manufacture or buy the Product from others or purchase or do any other act that directly or indirectly competes with the Product of the Manufacturer. The Distributor shall only sell products from other suppliers that are agreed upon with the Manufacturer.

1.8   Prohibition to sell
Outside the Territory.
The Distributor shall not directly nor indirectly under any circumstances sell the Product to customers outside the Territory. Vessels registered outside the Territory and vessels being built at shipyards within the Territory for owners outside the territory, shall be considered to be customers outside the Territory. All inquiries from such customers shall be transmitted to the Manufacturer.

The Distributor shall do its best endeavours to obtain information from the shipyard regarding the nationality of the vessel prior to presenting an offer in which the Product is included, in order to facilitate the distribution of commission between distributors. The quotation is to be prepared together with the Manufacturer, where the Manufacturer will decide the price depending on price and commission level in $3^{d}$ nation.

1.9   Secrecy
The Distributor shall not, even after the expiration of this agreement, disclose company secrets or other confidential information received from the Manufacturer to any third party, without the Manufacturer's approval. Furthermore the Distributor undertakes to show all necessary discretion in accordance with good business practice in relation to third parties on all questions connected with this agreement.

1.10   Assistance against unfair Competition and Infringements of industrial Property Rights
The Distributor shall inform the Manufacturer of all acts of unfair competition and of all infringements of industrial property rights of the Manufacturer, which comes to his

5

notice. He shall assist the Manufacturer to the best of his abilities to protect himself against such acts and infringements.

## 2.   DUTIES OF THE MANUFACTURER

2.1   Distribution
The Manufacturer undertakes to sell within the Territory only to the Distributor for resale to the fishing industry and shipyards. The Manufacturer shall take part in negotiations with institutes and/or fishery research, with the interest to obtain special agreements and contracts to special conditions. Reference is made to paragraph 1.1.

For delivery to a vessel being built, converted or refitted in the Territory, where the vessel is, or will be registered in another Territory after completion, the Distributor will receive 50% of the commission.

For delivery to a vessel of the Territory being built, converted or refitted outside the Territory, the Distributor will receive normal commission if the delivery is effectuated directly to the owner in the Territory.

2.2   Official Approval
The Manufacturer undertakes to supply products, which satisfy all requirements in respect of official approval, which are or will be stipulated by the relevant authority or association.

2.3   Documents and advertising Material
The Manufacturer shall assist the Distributor in giving him documentation, videos, demonstration SW, sales and promotional material made as standard material for Scanmar AS worldwide. He shall also provide the Distributor with available demonstration equipment ("dummies"), information concerning the characteristics and specifications of the products and other relevant material and illustrations in English.

2.4   Personnel
The Manufacturer shall participate with personnel in sales promotion activities and training of the Distributor's personnel to a reasonable extent and in accordance to what is agreed upon in the annual sales and marketing meeting.

2.5   Obligation to supply
The Manufacturer reserves the right to withdraw products from the market giving the Distributor not less than three months notice, unless reason for withdrawal is due to serious technical fault. Such withdrawal shall not incur any liability whatsoever towards the Distributor or any third party. In case of such withdrawal, this agreement shall automatically expire as regards any such product.

Unless otherwise agreed, the Manufacturer secures to supply spare parts for three years after end of production of such products.

6

2.6   Changes and Improvements
The Manufacturer reserves the right to make changes in the Product without incurring any liability whatsoever and without being obliged to make any corresponding changes or improvements in the Product previously manufactured unless otherwise agreed upon.

3.   DURATION

3.1   Termination
This Agreement is concluded for a period of one year. Thereafter it shall be subject to automatically renewal for successive periods of one year, unless terminated by either party by means of communication given in writing, ensuring evidence and date of receipt (e.g. registered mail with return receipt, special courier), not less than 6 month before date of expiry.

3.2   Premature Termination
This Agreement may be terminated forthwith by either party, if the other party:
   3.2.1   Becomes insolvent or enters into liquidation or receivership or a petition in bankruptcy is filed by or against him, or if he makes an arrangement for the benefit of his creditors or ceases doing business.
   3.2.2   Defaults in payment of any amount to the other party under this agreement or breaches any term or condition of this agreement or fails to perform any obligation hereunder and does not rectify such breach or default within the time stipulated by the other party in written notices.

By the Manufacturer:
   3.2.3   If any third party other than the present owners of the Distributor should gain decisive influence over the business of the Distributor through acquisition of a substantial part of its capital stock of the Distributorship, public ordinance or otherwise.
   3.2.4   If transaction of stocks/ownership between current owners of the Distributor disfavours the Manufacturer position in the Territory. Hence the Manufacturer shall approve transaction of stocks/ownership between current owners of the Distributor.

3.3   Disposal of Stock
Following termination the Manufacturer shall have the right to repurchase the stock of Products in the possession of the Distributor. Repurchase price will be the net price

paid by the Distributor. The Distributor shall be free to sell the saleable stock not bought by the Manufacturer, inside the Territory.

## 4.   INDEMNITY

The Distributor shall not be entitled to an indemnity for goodwill or similar compensation (indemnity) in case of termination of the contract.

## 5.   APPLICABLE LAW

The laws of Norway shall govern this agreement.

## 6.   ARBITRATION

All disputes in connection with this agreement or further agreements resulting thereof shall be finally settled by arbitration in accordance with the Rules of the Arbitration Institute of the Oslo Chamber of Commerce.

The number of arbitrators shall be 1
The place of arbitration shall be Oslo
The language of arbitration shall be English

## 7.   FINAL PROVISIONS

7.1   Force Majeure
The Force Majeure (Exemption) Clause of the International Chamber of Commerce (ICC Publication No.421) is hereby incorporated in this contract.

7.2   Prohibition to assign
This agreement cannot be assigned without the prior consent of the other party.

7.3   Modifications and Amendments
All modifications and amendments to this agreement must be made in writing.

7.4   Invalid Provisions
In case one or more provisions of this agreement are invalid, the validity of the remaining provisions of this agreement shall not be affected hereby.

7.5   Waiver of Rights
The waiver by either party to this agreement of any right whatsoever or the fact that it makes no objection or claim in the event of the breach by the other party of any clause hereunder shall not be deemed a waiver of any right whatsoever nor of any right to

8

make any objection or claim as regards any further or other similar or dissimilar breach by the other party of the present agreement.

7.6    Language
       The English text of this agreement shall be the original text.

7.7    Number of originals
       This agreement is issued in two originals, one for each party.

## 8.    FORMER AGREEMENTS

This agreement replaces all previously agreements between Scanmar AS and The Distributor.

Place, _Seattle_ Date _11/4/04_          _[signature]_ Pres
                                          The Distributor

Place, _Markebo_ Date _1/11- 04_          _[signature]_
                                          The Manufacturer

9

**Annex I**
## Conditions – stock of products and spare parts
Paragraph 1.2

This Annex I is applicable only if the parties have agreed upon a minimum local stock of products (complete units) and spare parts. and the distributor has been granted special terms.

This annex shall be applicable only if signed by parties. Further it shall be reviewed once a year and adjusted to current sales level.

§ 1.   The Distributor agrees to maintain a minimum stock of products and spare parts to cover at least 1 month projected sales. Products for stock shall be purchased and delivered once a month and consist of the following items:

| Article no. | Product | Quantity |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Place & date:

*Markaebi /11-04*

The Manufacturer

The Distributor

HYDRA·PRE, INC

# Annex II
## General conditions of sale and delivery
Paragraph 1.3

1. All Scanmar quotations, order confirmation and sales are based on these terms which shall override and exclude any other terms stipulated by or referred to the buyer, during the sales process and our acknowledgement of order.

2. The contract is in effect when Scanmar has duly issued the acknowledgement of order by issuing an order confirmation. The Manufacturer have the right to held back orders and shipment if the credit limits have been exceeded or if there are unpaid due debt.

3. Technical data and other information contained in sales literature, price lists etc. are for general information and only become binding to the extent it is expressly contained in a quotation or acknowledgement of order.

4. Prices and deliveries are based on "INCOTERMS", EXW Åsgårdstrand, if another term is not stipulated in the acknowledgement of order. Unless otherwise expressly agreed delivery times are indicative only.

5. All prices are based on the latest issue of the Manufactures price list. Payment terms are 30 days net payment to the Manufacturer bank account in Norway accessible at the due date. All payment fees shall be paid by the Distributor.

6. Prices are given in Euro if not otherwise agreed. The seller has the right to interest rate, 9%, per anno, plus fees to enforce payment of amount due, according to Morarenteloven (1.12. Dec. 1976 No. 100).

7. The distributor shall inspect the goods promptly – and in any case within 15 calendar days – upon arrival. He shall have the right to reject goods, which do not confirm with the contract (acknowledgement of order) – except minor defects, which do not influence the effective use of the goods – if the manufacturer cannot make good the default at his own expense within a reasonable period.

8. Scanmar further undertakes to remedy defects on new products resulting from faulty design, materials, or workmanship within a period of one year from installation or maximum 18 months from delivery EXW.

9. It is expressly agreed that the Distributor shall have no claim in respect of any loss or damage caused by the defect, including but not limited to loss of production, loss of profit or any other consequential damage and indirect loss, unless it is shown from the circumstances of the case that Manufacturer has been guilty of gross misconduct.

10. In case of sales on agreed credit terms, the products remain as property of Scanmar until it is fully paid. Credit limits and terms are evaluated yearly based on payment behaviour and experience last 12 months, latest annual report, available credit information and monthly purchase.

11. Manufacturer will not be responsible for claims or loss from Distributor or any third parties in case of delay or lack of ability to deliver equipment according to agreement.

## Annex III
## Reporting on sales from local stock and second-hand products
Paragraph 1.4.5 and 1.4.6

The Distributor agrees to report on monthly basis to the Manufacturer on sales from local stock and sales of second-hand products with serial number using the enclosed template.

The Manufacturer

Scanmar AS

The Distributor

HydraPro Inc.

Template Annex III
Scanmar monthly sales report

MONTH: ___ Insert month here ___ Sales of products with serial numbers

For this columns pls.enter one of the codes to the right

| Vessel | Owner | Type of Fishery | Item no. | Product | Serial no. | Boat code | Channel | From vessel | Type of sales |
|--------|-------|-----------------|----------|---------|------------|-----------|---------|-------------|---------------|
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |
|        |       |                 |          |         |            |           |         |             |               |

Alternatives for **Type** of sale:

| Code | Discription |
|------|-------------|
| N | New ( expanding system) |
| RL | Replacement for lost unit |
| RD | Replacement for damaged unit |
| B | Back-up |
| O | Other |

Date  01.11.2004

**Annex IV**
**Marketing activities and requirements**
Paragraph 1.5

> The yearly planning for marketing and sales activities in the territory is the main part of the budget process for optimal use of resources from both parts. This is considered by the Manufacturer as the yearly agreement to be fulfilled during the planning period. The plan shall have a minimum of contents as listed under.

Minimum of contents for sales and marketing activities:

- Market situation in the territory, divided in types of fishery.
- An overview of the existing customers with breakdown into groups based on fishery, seasons and Scanmar equipment with detailed activities for possible supplementary sales of Scanmar sensors.
- An overview of the existing customers with breakdown into groups based on fishery, seasons and Scanmar equipment with detailed activities for possible upgrades of Scanmar system
- An overview of the new customer prospect with breakdown into groups based on fishery and seasons with detailed activities for possible new sales.
- Follow up of Shipyards, vessel designers, vessel consultants and vessel owners to track plans of new building and rebuilding of vessels.
- Follow up of ship brokers and other sources for sales of vessel.
- Use of Scanmar Info, DM and other marketing materials in cooperation with Manufacturer as part of the activities and influence for supplementary, upgrades and new sales.
- How to use local newspaper and magazines for mention of Scanmar products.
- Exhibitions and seminars with necessary preparations for success.
- Use of resources for sea trails, exhibition, seminars, training, Scanmar I tour, etc from Manufacturer and coordination of plans.
- Reports from sea trails, seminar and user experience for articles to Scanmar Info.
- Outcome of activities as budget of sales based on number of units of each product.

As special agreed support for Marketing activities, Manufactor have agreed to support Distributor as
following :

| | | |
|---|---|---|
| Nov-04 – Jan-05 | US$ 4.687 per month |
| Feb-05 – Apr-05 | US$ 3.125 per month |
| May-05 – Jul-05 | US$ 1.562 per month |

This support is depending on specified sales resources for taking care of Scanmar sale and service activities. Follow-ups of activities planned and mention over from HydraPro Ltd.

The Manufacturer                                         The Distributor

Scanmar AS                                               HydraPro Ltd

# EXHIBIT "B"

## ARBITRATION AWARD

### In the arbitration case between

| | |
|---|---|
| **Plaintiff:** | Scanmar AS<br>P.O. Box 44, 3167 Åsgårdstrand<br>Norway |
| **Counsel:** | Attorney Fredny Bade and Attorney Anne Kielding Presthus<br>Advokatfirmaet Steenstrup Stordrange DA<br>P.O. Box 1829 Vika, 0123 Oslo<br>Norway |
| **Respondent:** | Hydra-Pro, Inc.<br>4259 22nd Avenue W, Seattle, WA 98199<br>USA |
| **Counsel:** | Self litigation |
| **Plaintiff in Cross-Action** | Hydra-Pro, Inc.<br>4259 22nd Avenue W, Seattle, WA 98199<br>USA |
| **Counsel:** | Self litigation |
| **Respondent in Cross-Action:** | Scanmar AS<br>PO Box 44<br>3167 Åsgårdstrand<br>Norway |
| **Counsel:** | Attorney Fredny Bade and Attorney Anne Kielding Presthus<br>Advokatfirmaet Steenstrup Stordrange DA<br>P.O. Box 1829 Vika, 0123 Oslo<br>Norway |

# CERTIFIED COPY

*Anne Kielding Presthus*
*advokat*   Oslo, 16 July 2010

−2−

On 8th July 2010 there was delivered by an Arbitration Court consisting of:

Attorney Gunnar Stake-Larsen, sole Arbitrator

such Award as is written hereunder:

**AWARD**

1.    **INTRODUCTION – BRIEF PRESENTATION OF DISPUTE**

1.1.   **Points of dispute**

The case concerns Claims and Counterclaims between a Manufacturer and a Distributor, regarding delivery and obligations following the cancellation of a Distributorship Agreement. This is the background:

Scanmar AS (hereinafter "Scanmar") entered into a Distributorship Agreement with Hydra-Pro Inc (hereinafter "HPSEA") dated 1st and 9th November 2004 (hereinafter the "Agreement"). The principal content of the Agreement is that HPSEA would undertake marketing support and sales of Scanmar's products in a defined Territory. The representation applied to the North American West Coast, including the states of Washington, Alaska, Oregon and California. The Court will revert with further details of the content of this Agreement.

The Agreement was cancelled on 27th December 2007 by email to HPSEA. The cancellation is justified in the email as follows:

"*Premature termination of Distribution Agreement*

*According to the Distributorship Agreement signed between Scanmar AS and Hydra-Pro, Inc. on Nov. 07, 2003 paragraph 3.2, Scanmar hereby terminate the Agreement due to Hydra-Pros' lack of will and/or ability to settle outstanding debt.*

*Scanmar considers this a serious breach of contract, especially since Hydra-Pro is not able to serve the US customers with Scanmar products.*

*We also note that you have instructed Cliff to withhold further payments, according to your e-mail to Knut Halvorsen Dec. 21. This, of course, is in no way acceptable, and Scanmar expects Hydra-Pro to settle the debt immediately.*"

The letter is signed by Scanmar's Chairman, Mr Henning Skjold-Larsen.

As will be seen the justification for the cancellation was that HPSEA was in payment default and, in Scanmar's opinion, lacked the will and ability to settle its obligations.

−3−

Since the cancellation of the Agreement, Scanmar has demanded payment for a series of deliveries to the company that were open items at the date of termination on 27th December 2007.

HPSEA admits to owing only parts of the amount since – in that company's opinion – there is insufficient documentation for the full demand.

Scanmar at the date of termination had also supplied a range of goods to HPSEA which Scanmar has defined as "goods in consignment".

HPSEA at the Oral Hearing disputed that there is any commission arrangement, but has not contested that the goods were supplied. Scanmar demands payment for these consignment goods. HPSEA claims acquittal in return for returning the goods.

Scanmar further demands financial compensation from HPSEA as a result of the default. This default builds – Scanmar feels – on the payment default that has caused cancellation of the Agreement and ensuing losses. They also claim that there exist grounds for compensation from HPSEA as the result of failure to return the consignment goods. This liability is further grounded in HPSEA's default on its obligations in respect of the marketing support the company was supposed to engage in under the Distributorship Agreement. Scanmar also holds the view that there is a breach of contract, due to the failure to maintain a sufficient stock of goods as described in the Agreement.

Scanmar has contended that the actions of the opponents made them liable to pay loss compensation, and therefore demand such compensation. These losses consist of:

- Loss of sales revenues in 2007
- Loss of sales revenues in 2008
- Loss of specifically identified Purchase Orders (POs).

Furthermore, Scanmar demands recovery of the currency losses that the company suffered as the result of a change in the exchange rate from the date of maturity of the invoices issued, compared to today's exchange rate. They also demand remuneration for costs of counsel prior to the actual arbitration case.

Finally they demand that HPSEA shall reimburse Scanmar's legal costs and costs before the Arbitration Court and Oslo Chamber of Commerce. The arguments will be analysed in more detail in Paragraph 3, below.

For its part, HPSEA has argued that Scanmar was not entitled to cancel the Distributorship Agreement and representation within the Territory. It is argued that a payment plan was in place, that both Parties had agreed to. Scanmar could not, therefore, terminate the representation, since no default existed. They also argue that Scanmar for some time had been planning to replace the Distributor with another company, Rapp Hydema Inc.

HPSEA argues that the unjustified cancellation incurs a liability for compensation.

The losses that the Respondent claims he suffered in connection with the case are demanded recovered in full. Apart from demanding acquittal in the Main Action, he has raised a Cross-Action with a demand to recompense for loss of revenues suffered by HPSEA. They also demand payment for overdue invoices for marketing support activities.

–4–

HPSEA has entered a plea for acquittal in respect of the claim for payment of the consignment goods, since the company is offering to hand them back.

Apart from acquittal in the Main Action, and the claim for compensation in the Cross-Action, they demand reimbursement of legal costs. The arguments are analysed in more detail in Paragraph 4 below.

This Arbitration Court's view of the matter is discussed at Paragraph 5, below.

## 1.2.    Arbitration proceedings

In accordance with the Distributorship Agreement, paragraph 6, Scanmar demanded a decision in this dispute by regular arbitration, in line with the Rules of the Arbitration Institute of the Oslo Chamber of Commerce. The Parties nominated Attorney Gunnar Stake-Larsen as the sole Arbitrator. Under the terms of the Arbitration Agreement the language of the dispute is English. A Complaint was filed with the Court on 13th July 2009 and the Court was duly constituted on 19th October 2009.

The Parties have exchanged Claims and Replies and various subsequent pleadings.

In a Reply Pleading to the Oslo Chamber of Commerce of 16th September 2009, the company Hydra-Pro Dutch Harbor Inc gave notice of its entry into the case. The Plaintiff, Scanmar, contested this company's right to step into the action. In accordance with the Rules of Arbitration of Oslo Chamber of Commerce, a special ruling was issued on 25th March 2009 by the Arbitration Court, which determined that the Arbitration Agreement did not encompass Hydra-Pro Dutch Harbor Inc. Accordingly this company was denied further involvement in the arbitration proceedings. The case continued between the original Parties, Scanmar and HPSEA.

On 3rd May 2010 a formal Cross-Action was raised by HPSEA with an independent claim for award of compensation from Scanmar.

The Respondent HPSEA, during the case preparations, has been represented by the legal counsel Advokatfirmaet Bull, care of Attorneys Bjørn Blix and Ina Heidenreich. In a pleading of 4th June 2010, shortly before the Oral Hearing, this firm of attorneys stepped down as the counsel for HPSEA. HPSEA was thus a self-litigating party during the hearings and was represented by the Chief Executive Officer, Ed Ramberg, and Chief Financial Officer, Cliff McKinney.

In an email of 28th May 2010 and pleading of 2nd June 2010, HPSEA's attorney informed the Court that HPSEA would apply either for debt settlement proceedings under Chapter 11, or bankruptcy proceedings under Chapter 7, of the US Bankruptcy laws. Accordingly they pleaded for cessation of the arbitration proceedings. The plea for cessation was not admitted, since there was no documentation that bankruptcy proceedings had been initiated. This Court has not received any new information about the matter prior to the delivery of the judgement.

The Oral Hearing was held in the period 8th to 10th June 2010. Parties gave testimony in the persons of Mr Henning Skjold-Larsen, on behalf of Scanmar International AS, and

–5–

Messrs Ed Ramberg and Cliff McKinney on behalf of HPSEA. Telephone interviews were also conducted with Tim Tilleman and Ulf Lundvall.

## 2.      FURTHER ON THE PARTIES AND CASE CIRCUMSTANCES

### 2.1.    Scanmar

Scanmar was founded in 1980 and is a member of the Scantech Group. The company is based in Åsgårdstrand, Norway. The company develops, manufactures and sells various products to the fishing industry. These products are largely catch control systems, which build on advanced technology for control and monitoring of the trawl, and other equipment for fishing. The company supplies customers all over the world, for both bottom sea fisheries and mid water and pelagic fisheries. Scanmar delivers to about 1500 boats world wide. In the Territory in question, we are told that Scanmar supplies 50 boats which are involved in bottom fishing, and 65 which operate in mid water or pelagic fisheries. The company thus retains a large market share both world wide and within the Territory. The company's Chief Executive Officer is currently Mr Ulf Lundvall, who has taken over from the founder of Scanmar, Mr Henning Skjold-Larsen, who is now the company Chairman.

### 2.2.    HPSEA

HPSEA is a marine crane and equipment sales, service and manufacturing company located in Seattle, Washington, USA.

HPSEA is a private limited company registered in the United States and owned 100 % by Mr Ed Ramberg, who is also the President of the company. Mr Ed Ramberg was born and raised in Norway before emigrating to the USA. HPSEA has been engaged in the business for approximately 15 years.

HPSEA works in partnership with another company, Hydra-Pro Dutch Harbor Inc, in which Mr Ed Ramberg owns 67 % of the shares, and Tim Tilleman 33 %. However, this latter company is not a part of the present arbitration case following the Arbitration Court's ruling of 25th March 2010.

### 2.3.    Distributorship Agreement

The Distributorship Agreement between Scanmar and HPSEA was established on 1st November and 9th November 2004. The Agreement replaces an earlier agreement of 7th November 2003, a fact that is of no consequence for the adjudication of this case. The duration of the distributorship under the terms of the Distributorship Agreement is one (1) year, with automatic renewal on an annual basis.

Prior to signing the Distributorship Agreement, Scanmar sold its products on the US fisheries market in the Seattle area, Canada and Alaska through its own dedicated organisation.

The renewed Distributorship Agreement *"replaces all previous agreements between Scanmar AS and the distributor"*, see Section 8 of the Agreement. According to the Distributorship Agreement, HPSEA would be Scanmar's distributor in Washington, Alaska, Oregon and California – referred to as the "Territory". According to the Agreement, HPSEA has the right to buy and sell Scanmar products in its own name for its own account.

−6−

The Court will reference some of the key provisions in the Distributorship Agreement which regulate the rights and duties of the Plaintiff and Respondent in the paragraphs below.

In the Agreement, Paragraph 1.1, the legal status of the distributor is defined:

> *The Distributor buys and sells in his own name and for his own account to the fishing fleet in the Territory and to local shipyards for vessels being built for the Territory. The Distributor also has the right to sell supplementary products to fishery research vessels in the Territory, while the Manufacturer shall handle new buildings for fishery research based on information from the Distributor. He shall effectively promote the sale of the Product in the Territory, and shall safeguard the interest of the Manufacturer with the due diligence of a responsible businessman. ..."*

As for the sales organisation, service and stock, the Distributorship Agreement, section 1.2, decrees as follows:

> *"The Distributor shall at all times have an efficient and competent sales and after sales organisation in the Territory for sales promotion and service of the Product. Local dealers shall be appointed in main ports to be able to provide first line service and sales, change of dealers shall be approved by Manufacturer. Educationg and training of the dealer is the responsibility of the Distributor.*
>
> *The Distributor shall maintain a minimum stock of complete units, to cover at least sales and warranty replacement for the forthcoming month, as agreed to in annex 1. Further he shall hold an adequate stock of spare parts to enable prompt repair and deliveries to customers within the Territory. An inventory shall be reported at the end of each year.*
>
> *The Distributor shall have necessary equipment and trained people for service and repair.*
>
> *The Manufacturer retains the right to market and sell by itself the Product in case of negligence or incapacity on the part of the Distributor, i.e. on the occasion of loss of key personnel and/or lack of promotional activities."*

In Paragraph 1.3, which deals with prices and conditions, the following is stated, among other things:

> *"The Distributor buys the Product at prices and terms given by the Manufacturer.*
>
> *The Distributor is obliged to supply name of vessel and owner of vessel when ordering the Product from the Manufacturer, unless Products are ordered for stock, then it is subject to paragraph 1.4.5.*
>
> *The Distributor is obliged to supply the Manufacturer with retail prices and margins given to dealers in the Territory as part of budget and market plans each year."*

According to the Agreement, HPSEA has the responsibility to market and place orders with customers, issue Purchase Orders (POs) to Scanmar, to which Scanmar should respond with confirmation of the POs and shipment to HPSEA, directly billing HPSEA pursuant to the Scanmar price list. HPSEA delivered the products to the customers, and invoiced the

customer with a 1.57 mark-up of the purchase price from Scanmar. HPSEA's revenues (from time to time described as "commission") would be the difference between Scanmar's price to HPSEA and HPSEA's price to its customers.

There are also special provisions that deal with budgeting, reporting and marketing activities that HPSEA as the Distributor undertook. Since one point of dispute refers to whether or not there is a default in respect of these marketing obligations, the Court finds it useful to quote from the said provisions in the Distributorship Agreement, Paragraphs 1.4 and 1.5, which read:

    *"1.4   Budgets, Reporting and Market Information*
          *The Distributor shall keep the Marnufacturer informed of his activities as well as of the market conditions within the Territory*

        *1.4.1   Before the 10th of October of each calendar year, the Distributor and the Manufacturer shall agree upon sales budget and market activities in the Territory for the forthcoming year. Final agreement shall be made in a meeting at the Manufacturer premises, unless else agreed.*

        *1.4.2   The Distributor shall send to the Manufacturer a report of the development of the fishing industry in the Territory containing; economy, new buildings, rebuilding, sales / purchase of second hand vessel and information about owners/fishing companies, management companies, shipyards and Ship consultants quarterly or when required.*

        *1.4.3   The Distributor shall send the Manufacturer by the end of each Month a brief report of marketing activities performed, and a plan for the following 3 months.*

        *1.4.4   The Distributor shall inform the Manufacturer of vessels that, are sold, sold out f country, have changed name.*

        *1.4.5   All sales of the Product from local stock shall be reported at least once a month using template per annex III.*

        *1.4.6   All sales of second-hand Products within the Territory by the Distributor have to be reported consecutively using template in annex III.*

    *1.5   Marketing*

        *The Distributor shall at his own expense undertake appropriate marketing activities, such as advertising, participation in fairs, and distribution of promotional material and documentation as agreed in budget and marketing plan (annex IV).*

        *1.5.1   The Distributor shall at his own expense, undertake translation of Scanmar Info, Direct Mails (DM) and other relevant documentation provided by the Manufacturer and adapt it to the needs of the local market.*

–8–

> 1.5.2   *The Distributor shall participate in sea trials for training, installation and demonstration and provide the Manufacturer with user experiences, Pictures and statement from the local fishing fleet.*
>
> 1.5.3   *The Distributor shall actively use Scanmor Info and DM (direct mail) and other promotional material in his sales and marketing work. The Distributor shall contribute with articles and user benefits from hislocal market to Scanmar Info and DM on request, and translate articles for local distribution."*

Annex IV to the Agreement contains further specification of what minimum conditions are made for sales and marketing activities. The activities and reports that are referred to there are as follows:

> "• *Market situation in the territory, divided in types of fishery.*
> • *An overview of the existing customers with breakdown into groups based on fishery, seasons and Scanmar equitpment with detailed activities for possible supplementary sales of Scanmar sensors.*
> • *An overview of the existing customers with breakdown into groups based on fishery, seasons and Scanmar equipment with detailed activities for possible upgrades of Scanmar system.*
> • *An overview of the new customer prospect with breakdown into groups based on fishery and seasons with detailed activities for possible new sales.*
> • *Follow up of Shipyards, vessel designers, vessel consultants and vessel owners to track plans of new building and rebuilding of vessels.*
> • *Follow up of ship brokers and other sources for sales of vessel.*
> • *Use of Scanmar Info, DM and other marketing materials in cooperation with Manufacturer as part of the Activities and influence for supplementary, upgrades and new sales.*
> • *How to use local newspaper and magazines for mention of Scanmar products.*
> • *Exhibitions and seminars with necessary preparations for success.*
> • *Use of resources for sea trails, exhibition, seminars, training, Scanmar I tour, etc from Manufacturer and coordination of plans.*
> • *Reports from sea trails, seminar and user experience for articles to Scanmar Info.*
> • *Outcome of activities as budget of sales based on number of units of each product."*

The Distributorship Agreement also determines that disputes under the Agreement are to be resolved under Norwegian law.

The Distributorship Agreement also contains provisions relating to "premature termination".

The Distributorship Agreement has a duration of one (1) year with renewal for one (1) year at a time, unless cancelled by either of the Parties by giving six (6) months of prior written notice.

Paragraph 3.2 in the Distributorship Agreement reads as follows:

> *"3.2   Premature Termination*
> *This Agreement may be terminated forthwith by either party, if the other party:*
>
> > *3.2.1   Becomes insolvent or enters into liquidation or receivership or a petition in bankruptcy is filed by or agains him, or if he makes an arrangement for the benefit of his creditors or ceases doing business.*
> >
> > *3.2.2   Defaults in payment of any amount to the other party under this agreement or breaches any term or condition of this agreement or fails to perform any obligation hereunder and does not rectify such breach of default within the time stipulated by the other party in written notice."*

Paragraph 3.3 in the Distributorship Agreement deals with:

> *"3.3   Disposal of stock*
> *Following termination the Manufacturer shall have the right to repurchase the stock of Products in the possession of the Distributor. Repurchase price will be the net price paid by the Distributor. The Distributor shall be free to sell the saleable sock not bought by the Manufacturer, inside the Territory."*

As quoted above, the Distributor has an obligation, under Paragraph 1.2 in the Distributorship Agreement, to *"maintain a minimum stock of complete units, to cover at least sales and warranty replacement for the forthcoming month, as agreed to in Annex 1."* As Annex I to the Agreement, a standard form is supplied, that shows how such a minimum stock should be reported.

The Distributorship Agreement also contains in Annex II the General Conditions of Sale and Delivery for Scanmar, which include the statement in Paragraph 6 that the overdue interest rate shall be 9 % per annum.

Regarding the delivery obligation, the General Conditions of Sale and Delivery state as follows in Paragraph 2:

> *"The contract is in effect when Scanmar has duly issued the acknowledgement of order by issuing an order confirmation. The Manufacturer have the right to held back orders and shipment if the credit limits have been exceeded or if there are unpaid due debt."*

## 2.4.   Practice of the Agreement by the Parties

The Parties do not agree on the success or otherwise of the representation arrangement, in the sense that it may or may not have caused an increase in sales of Scanmar's products. In Scanmar's view, the efforts by the Distributor were unsatisfactory, whereas HPSEA claims that they did what was possible to establish a good market for Scanmar's products in the Territory (Washington, Alaska, Oregon and California).

It seems to this Court as if HPSEA has continued the previous sales activities which Scanmar operated within the Territory. The sales figures for 2006 are higher than the other years, which -- according to the witness testimony from Henning Skjold-Larsen -- is due to the introduction of a new product series that enhanced people's interest in, and therefore sales of, Scanmar products.

–10–

No stock was built up by HPSEA, as the contract prescribes. The Court will return regarding the significance of this fact. The Court must find, in light of the evidence, that the failure to develop such a stock was due to the lack of financial capacity in HPSEA.

Scanmar had a need to develop a product stock to meet the needs of customers. For that reason an arrangement was introduced whereby Scanmar sent goods to HPSEA, for which the invoices stated a specific credit limit, for example, four months, three months and one month. This stock, which the Court feels can rightly be called a "consignment stock" in the sense of the contract, was not settled by HPSEA and amounted, at the time of cancellation of the Agreement, to USD 244,831.

Following testimony it is clear that HPSEA significantly failed to pay due invoices issued by Scanmar for ongoing deliveries. As of the date of termination of the contract, this amount was USD 104,538.

Some email correspondence was engaged in between the Parties in which HPSEA expressed dissatisfaction with the inability to identify invoices in relation to the Purchase Orders which were issued by HPSEA. The company stated on several occasions in 2007 that they would not honour bills due to these "discrepancies". HPSEA nonetheless gives the impression on several occasions in the email exchanges that the company has payment problems and is not in a position to pay on due date. The Court refers in this connection to the email correspondence in autumn 2007, documented in Court, see in particular the email from Cliff McKinney, in which it says that HPSEA would like to pay, but that he *simply does not have the money*".

Scanmar requested on several occasions, including in the email presented in Court, payment by HPSEA.

HPSEA has invoked the argument that the Parties had agreed to a payment plan which meant that HPSEA could not be considered to be in default towards Scanmar. The Court will return to this point more exhaustively in the Deliberations, below.

Scanmar, according to their own information, became seriously worried about the situation and the outstanding claims as the autumn drew on in 2007. This fear was strengthened, in Scanmar's perspective, at the Fair that took place in Seattle on 18th-20th November 2007, at which Scanmar's Chairman had a discussion with CFO Cliff McKinney in the latter's office.

Following that, several emails were exchanged between the Parties until the cancellation point on 27th December 2007.

On 20th December 2007, HPSEA supplied the names and contact details of the ships that were the relevant customers in respect of the issued Purchase Orders.

After Scanmar had contacted their counsel on 21st December 2007, it was agreed to cancel the contract, which fact was communicated by email of 27th December 2007, as referenced above.

It has been shown that Scanmar, immediately after cancellation, made direct contact with the customers and informed about the termination of the representation. Reference here is to the emails of 4th January 2008 and 11th February 2008, respectively.

The Parties disagree as to how far Scanmar, in its own name, after the cancellation date, effectuated the Purchase Orders that existed in November-December and had been received by HPSEA, but were forwarded to Scanmar. The Court will return to this under the Deliberations below.

Scanmar serviced the customers after the cancellation of the representation by direct contacts. They were also assisted by Elias in Dan Trawl, who helped with the storage function.

From August 2008 a formal collaboration was established with the company Rapp Hydema Inc. Scanmar has argued that this company is a service station, not a full-blown distributor. The Court finds, however, based on the testimony of the Parties, that the company performs in essence the same functions as HPSEA. It is nonetheless true that they have a smaller Territory.

Scanmar in 2008 and 2009 had almost the same gross sales on products within the Territory as in 2007. According to the Chairman's testimony in Court, the year 2010 will be a poor one, whilst starting in 2011 there are expectations of clearly better returns due to a new product line.

Goods in consignment have not been shipped back to Scanmar. HPSEA has – as they themselves state – been advised by their counsel not to send them in return, but have taken steps towards doing so in connection with the actual court case. In the legal hearings we were told that the goods are now on their way back to Norway and they offered to present evidence. As the Plaintiff could not show evidence to the contrary and the new evidence offered at the Oral Hearing, the Court has found that it cannot be swayed by these new arguments and offers of evidence. The Court must therefore find that the consignment goods still remain in HPSEA's possession.

The Parties have held negotiations for a private resolution of the matter but without success.

## 3.    SCANMAR'S ARGUMENTS

### 3.1.    Main Action

### (i)    Outstanding debts

The Plaintiff is demanding in the first place payment as per the contract for goods delivered in the total of USD 104,538. These invoices are priced as per the contract and remain unpaid.

The correction summary that HPSEA has presented as Annex 4 with the Cross-Action of 3rd May 2010 is contested. There are no corrections to be made to these amounts. It is noted that the largest item of them all is the invoice of 9th January 2007, amounting to USD 12,263, which refers to a return shipment, where the goods, according to the UPS, have been mislaid. The manner in which the delivery terms are formulated means that Scanmar is not responsible for lost goods, and HPSEA cannot deduct this item. The other items in the list of unpaid invoices are correct, in light of the testimony from Scanmar's General Manager, Mr Ulf Lundvall.

–12–

Interest is demanded on the individual invoices, from due date until payment occurs, at the agreed penalty interest in the contract, namely 9 % per annum.

**(ii)    Stock not returned**

The Plaintiff has argued moreover that they have a claim for payment for unreturned consignment goods. In light of the documented summary this amounts to USD 244,538. The amount was invoiced in November 2008 as the result of failure to return.

The Respondent cannot be heard when he claims that the goods can be returned today. There was a clear duty to return the goods at the time the Distributorship Agreement terminated. Scanmar presently has no need to get these goods returned, since the company is abundantly supplied with spare parts for existing customers, for the products sold. Moreover, Scanmar is presently developing a new product line and therefore have no use for the products. The goods are not obsolete, but are of no value to the Plaintiff today.

The legal basis for the claim is default on the return obligation. Moreover there was a general default of the duty of care for the goods, which were in the care of another. See, here, for reference the general legal foundation, and Christian V's Norwegian Laws, section 5-8-17, which lay down the General Duty of Care under Norwegian law. The Respondent has retained the goods as his own, and must therefore pay the full invoice value of them, whether this is deemed a sale in accordance with the contract, or as a measure of damages for irresponsible behaviour.

In the same way as above, interest is demanded for the consignment goods, from the due date plus the contractual 9 % per annum penalty interest.

**(iii)    Loss on exchange rate**

Scanmar notes that the dollar exchange rate has declined from the date when the invoices should have been paid until today's date.

This is a loss that must be compensated by the Respondent. Reference is made here to the general principles in the Act on Overdue Payments, and the principles in the Promissory Note Act, section 7, second paragraph. The Plaintiff has documented what losses have been suffered at the time of holding the Oral Hearing.

Interest is demanded according to the Norwegian Act on Overdue Payments.

**(iv)    Indemnity for lost sales; 13 taken POs**

Through HPSEA, Scanmar had received thirteen Purchase Orders which they were unable to service before the fishery fleet left Seattle in January 2008. This represents a loss of sales for Scanmar.

Most of these customers were represented at the convention in Hirtshals, Denmark in autumn 2007. Scanmar made contact with most of these companies, trying to implement the sales as intended. This failed to succeed, except in one case. The relevant PO for which success was achieved was PO 001529 – Sea Fisher. The total lost revenues from "POs not taken" represents € 172,055 for nine POs and € 35,214 for the remaining POs, less

−13−

deliveries on PO 001529 to Sea Fisher. The lost sales are a direct consequence of the payment default and cancellation of the contract, and must therefore be compensated. There are indemnity grounds here, either on the basis of objective liability, or on the basis of negligence.

Additionally the Plaintiff demands interest according to the Norwegian Act on Overdue Payment from 7th January 2010 (one month after the demand which is the time in the Points of Claim).

**(v)    Additional loss prior to terminations – breach of marketing obligation**

Scanmar argues that the company has lost significant revenues in 2007 as the result of HPSEA's default on its obligations to market the products. Through the Distributorship Agreement and General Conditions of Sale and Delivery, and the emails of 30th and 31st October 2006 between Ulf Lundvall and Ed Ramberg, a clear expression is given of what demands Scanmar has made of HPSEA.

Scanmar also notes that HPSEA has not followed up on the market, as they were supposed to, after the customer meeting with Dan Trawl in Hirtshals in November 2007. This was a reference, not just to the POs mentioned, but also the marketing consequences beyond that.

Based on the presented accounting figures, Scanmar has argued that the company has suffered a reduction in sales of NOK 2.4 million in 2007. The company has had a gross margin on the sales of 80 % and therefore demands 80 % of the amount recovered.

Scanmar also demands interest according to the Norwegian Act on Overdue Payment starting 7th January 2010.

**(vi)    Additional loss after termination – future sales**

Due to the default, Scanmar was without a new distributor. It is self-evident that this has caused a significant additional loss to Scanmar over an extended period.

Even though Scanmar arranged for a new distributor in August 2008, it still took many months to build new confidence in the market. Scanmar suffered further losses in the form of diminished sales and loss of goodwill in the market.

Based on the presented accounting figures, Scanmar has argued that the loss in future sales revenues is NOK 2.4 million for which Scanmar demands compensation, assuming a gross margin of 80 %.

As noted above interest is demanded according to the Norwegian Act on Overdue Payment commencing on 7th January 2010.

**(vii)    Legal costs**

In addition to the aforesaid items the Plaintiff demands reimbursement of legal assistance costs prior to the filing of the case.

−14−

Based on the default that exists, such costs are only to be expected, although they must be deemed "consequential damages". The reference here is that in this case, they are due to what the Plaintiff believes is an "intentional breach of contract" and the liability basis is therefore clear.

The legal costs amount to NOK 55,450.

Interest is demanded according to the Norwegian Act on Overdue Payments commencing on 7th January 2010.

**(viii)   Legal costs and outlays in the Arbitration Court and Oslo Chamber of Commerce**

With reference to the Arbitration Act, sections 39 and 40, and the Oslo Chamber of Commerce's Rules of Arbitration, the Plaintiff demands recovery of Scanmar's legal costs, and that HPSEA shall cover the Arbitration Court's fee and the Oslo Chamber of Commerce's fee and costs.

In his Statement of Costs, the Plaintiff has provided a summary of all the factors that dictate that the cost liability should be borne by HPSEA alone. The Court quotes:

> "● *HPSEA forced Scanmar to initiate the Arbitration by not following up several attempts from Scanmar to settle the dispute. This both prior to Arbitration, and under the preparations for Oral Hearing;*
> ● *HPSEA deliberately withheld stock in consignment, in order to improve their position to negotiate with Scanmar regarding the overdue debts;*
> ● *HPSEA did not even pay undisputed debt, forcing Scanmar to litigate on all aspects of the dispute;*
> ● *HPSEA rejected Scanmar's offer to agree on written proceedings;*
> ● *HPSEA rejected Scanmar's offer to agree on fast track proceedings (OCC);*
> ● *HPSEA's effort to bring in HPDH as a party;*
> ● *HPSEA's negligence of the Distinct Award denying HPDH to intervene;*
> ● *HPSEA pretending to be open for negotiations;*
> ● *HPSEA threatening to file for bankruptcy right ahead of Oral Hearing;*
> ● *HPSEA's attorneys withdrawn from assignment right ahead of Oral Hearing;*
> ● *HPSEA's non responding to requested information/documentation, including regarding Financial Statements, practical arrangements, witnesses."*

**3.2.    Scanmar's rejoinders in the Cross-Action**

**(i)    Indemnity for lost sales (4 POs not honoured)**

Scanmar does not accept any basis for liability. HPSEA has demonstrated an enduring and significant default of its payment obligations. For that reason, cancellation of the Distributorship Agreement was justified. In the same way, Scanmar was not obliged to service the four POs on account of the serious default that HPSEA was involved in. Scanmar could not be bound to make further sales on credit, see the General Conditions of Sale and Delivery, Point 2.

The Plaintiff also argues that the claim is statue-barred, as defined in the Norwegian Statute of Limitations , section 2.

### (ii)     Outstanding marketing support payments

Scanmar sees no basis for these invoices, since they are linked to the salary for Mr Ed Woods, who has not performed the work that is being invoiced. The obligation to conduct marketing support was also in default, and that is another reason why payment cannot be claimed.

Moreover, the claims date from so long ago that they must be statue-barred, and in any case, lapsed due to laches .

### (iii)     Claim for recovery of business expectancy for expected sales

In response to this claim, Scanmar has argued that there has existed an enduring and significant payment default that justified the cancellation, and therefore there is no occasion for a claim from HPSEA. Secondarily, Scanmar argues that HPSEA's commission must in any case be limited to sales in the residual contract term, which expired on 31st October 2008.

Thirdly, Scanmar argues that the claim is statue-barred.

### (iv)     Claim for recovery of business expectancy for expected labour (services)

In the same way as above, Scanmar argues that HPSEA is in default and cannot therefore, Scanmar feels, make a claim.

Secondarily, Scanmar argues that it was not involved in such service work, a fact that was supported – Scanmar feels – by the Party Testimonies. When no such work has been performed, then nor is there any claim for purported loss of earnings associated with it.

Under all circumstances it is noted, again, that any claim must be deemed barred and, under all circumstances, lapsed due to laches.

### (v)     Indemnity claim for HPDH's claims against HPSEA

Scanmar rejects the claims raised by HPSEA referring to the loss that Hydra-Pro Dutch Harbor Inc has suffered in connection with the case.

The Arbitration Court in its ruling of 25th March 2010 has with final effect determined that any claim that Hydra-Pro Dutch Harbor Inc might have had against Scanmar cannot be brought to bear in this present case. It would be a breach of, and disrespectful of, the Court's decision, if this claim were to be raised anew. There exists no basis for presenting the claim anew as is now being done. It is not possible to see how HPSEA could have any responsibility for Hydra-Pro Dutch Harbor AS which would lead to a liability toward the Alaska-based company that could be brought to bear against Scanmar.

Secondarily, Scanmar argues that, even if HPSEA could invoke claims that originate from Hydra-Pro Dutch Harbor Inc, the claims are nevertheless by their nature such that reimbursement cannot be demanded. The existence of any liability basis is disputed, as is the existence of any financial loss in relation to the company.

−16−

Under all circumstances it is argued, again, that any indirect claims that originate from deliveries from Hydra-Pro Dutch Harbor Inc are statute-barred since they were not presented to Scanmar until the Cross-Action, and the claims have in any case lapsed due to laches.

**(vi)    Compensation for legal costs prior to the Arbitration – compensation for HPSEA's internal cost – compensation for all arbitration cost**

Scanmar refers in this connection to the arguments above regarding liability for cancellation of the contract. Thus there is no liability basis in this matter.

In so far as internal costs are concerned, reference is made to the Arbitration Court's ruling of 25th March 2010 concerning the recoverability of such costs.

**3.3.    Scanmar's claims**

Scanmar has entered the following Claims:

In the Main Action:

> "1.     HPSEA shall pay to Scanmar for outstanding debts (invoices) an amount determined by the Arbitrator limited to USD 104,538, calculated by the exchange rate current at the invoices' due date, or the equivalent amount in EUR, within 14 days from the service of the Award, added penalty interest of 9 % per anno starting from the due date of the invoices until payment is made.
>
> 2.     HPSEA shall pay to Scanmar for stock not returned an amount determined by the Arbitrator limited to USD 244,831, calculated by the exchange rate current at the invoice's due date, or the equivalent in EUR, within 14 days from the service of the Award, added penalty interest of 9 % per anno starting from the due date of the invoice until payment is made.
>
> 3.     HPSEA shall pay to Scanmar indemnity for loss on exchange rate an amount determined by the Arbitrator limited to USD 62,252, within 14 days from the service of the Award, added penalty interst of 9 % per anno starting from the due date until payment is made.
>
> 4.     HPSEA shall pay to Scanmar indemnity for additional losses at an amount determined by the Arbitrator within 14 days from the service of the Award, added the penalty interest applicable at any time, in accordance with the Norwegian Act on Overdue Payments starting 7 January 2010 until payment is made.
>
> 5.     HPSEA shall pay all costs related to the Arbitration, including the prepaid fee to the Oslo Chamber of Commerce, the Arbitrator's fee and Scanmar's legal fees, within 14 days from the service of Award, added the penalty interest applicable at any time in accordance with the Norwegian Act on Overdue Payments starting from the due date until payment is made."

With regard to the Cross-Action from HPSEA, Scanmar enters the following Claims:

> *1.     HPSEA is denied the right to return to Scanmar equipment held in
>         consignment as an alternative to paying indemnity for the invoice related
>         thereto.*
>
> *2.     Scanmar is acquitted of all other counterclaims.*
>
> *3.     HPSEA shall pay all costs related to the Arbitration, both the Arbitrator's fee
>         and Scanmar's legal fees within 14 days from the service of the Award, added
>         penalty interest applicable at any time in accordance with the Norwegian Act
>         on Overdue Payments starting from the due date until payment is done."*

## 4.     HPSEA'S ARGUMENTS

### 4.1.    HPSEA's arguments relating to Scanmar's claims in the Main Action

#### (i)     Outstanding debts

HPSEA does not dispute that Scanmar has supplied goods and has an outstanding amount
that has not been paid. However, from the outset of the representational arrangement, there
has been a lack of information and disagreements about the invoices that were sent relative
to the POs that existed. This was pointed out on several occasions, see the emails
documented in the preliminaries to this case.

Specifically, HPSEA has identified overpayments or erroneous payments by Scanmar
totalling USD 19,075.00, which means that the correct amounts of the outstandings should
be USD 85,463. The reduction in the outstanding amount is found from Annex 4 to the
Cross-Action of 3rd May 2010. The relevant items are Invoice nos. 611301, 611330, 611623
and 710026. HPSEA reiterates the position that the last of these invoices should not be
honoured, since the goods have been shipped back to Scanmar.

#### (ii)    Equipment in consignment not returned

HPSEA accepts that it has had goods in its possession that must be returned to Scanmar,
see the Cross-Action, page 13.

The products have been stockpiled in a temperature-controlled store and are fully
serviceable. Return of the goods is offered. Indeed, the goods are in transit.

HPSEA therefore demands acquittal from the claim in return for surrender of the goods.

#### (iii)   Loss on exchange rate

HPSEA disputes that there exists any legal basis for such a claim.

#### (iv)    Indemnity for lost sales; 13 taken POs

No estimate or documentation has been presented for the purported amount.

−18−

Scanmar itself took the risk of terminating the Distributorship Agreement on 27th December 2007, right before the "A" season in the North-American fisheries. Scanmar must itself bear the risk for any losses they suffer as a result of their action.

### (v)   Indemnity for lost sales; breach of marketing obligation

Scanmar has failed to document or explain what HPSEA's possible breach of the marketing obligation might consist of. On the contrary, HPSEA will argue that the company, and its collaborative partner, Hydra-Pro Dutch Harbor Inc, have worked hard to fulfil their marketing obligations. The company has regularly visited customers onboard their boats. All boat owners who are customers have their home bases within a geographically limited area in Seattle, and they have been dealt with in a satisfactory manner. The marketing efforts must be tailored to the market in question, and cannot adhere to the rigid rules for reporting and so forth that the contract stipulates, and which are designed for larger distributorships.

### (vi)   Indemnity for lost sales

Scanmar has failed to present any estimate or other documentation of its purported "great loss".

Scanmar itself took the risk of terminating the Distributorship Agreement and by that action brought itself into a situation where it had to service the market. Scanmar was not forced to make the cancellation of distributorship and must therefore bear the responsibility for the loss itself.

### (vii)   Compensation for legal costs prior to the Arbitration

There is no documentation of such losses, and it is disputed that there is any legal basis for such compensation.

### (viii)   Compensation for all arbitration costs

HPSEA demands recovery of all costs incurred in connection with the case, including also the outlays for the District Court in Seattle, Washington, and outlays to the Arbitration Court in connection with the interlocutory order. A summary of all costs incurred has been presented, including outlays for Bull & Co, as well as Holmes, Weddel & Barcott PC, and also Attorneys Wiig Johansen AS.

Additionally, HPSEA demands that the Plaintiff shall cover all costs of the Arbitration Court in connection with the Oral Hearing and the costs of the Oslo Chamber of Commerce.

### 4.2.   HPSEA's arguments in Cross-Action against Scanmar

### (i)   Basis for claim in Cross-Action

HPSEA has argued that the case involves unjustified cancellation of the Distributorship Agreement by Scanmar. This uncontractual cancellation is the basis for the claims that follow in the points below.

HPSEA has fallen behind on its payments, but had a payment plan with Scanmar. Reference is made in this connection to the email exchange that took place between Cliff McKinney

–19–

and Scanmar, attention Roy Vidar Nilsen. Reference is also made to the discussions Cliff McKinney had directly with Henning Skjold-Larsen at the fair in Seattle.

The emails that were exchanged do not contain any warning that the representation would be terminated if payment was not made. If HPSEA had known that the distributorship was about to be cancelled, they would have had an opportunity to settle outstanding invoices. The amounts in question were not so large that it would have been impossible to make an extraordinary payment of the amount.

HPSEA believes that the reason the Distributorship Agreement was cancelled was a desire on Scanmar's part to change to Rapp Hydema as the new distributor, since the latter could help Scanmar find further inroads in the market for mid water and pelagic fishing. As evidence of this, HPSEA refers to the email exchange between Tim Tilleman in Hydra-Pro Dutch Harbor Inc and Knut Halvorsen in Scanmar, and further between Knut Halvorsen and Henning Skjold-Larsen. By email of 29th October 2007, Tim Tilleman states that he has heard from one of his customers, that Rapp had told him, that they would be taking over the Scanmar and Scantrol business. Knut Halvorsen states in the reply mail that he is not aware of that, and sends a copy of the email exchange to Henning Skjold-Larsen. Skjold-Larsen replies as follows in this mail [translation from Norwegian]:

> "Hi Knut,
> Wait a little before you say any more. Awaiting initiative from Ed. Then you say that we have a contract with Hydra-Pro which has not been cancelled, and therefore Rapp or others are irrelevant. But don't say anything yet.
> Henning"

The above shows – HPSEA believes – that there was a plan for Rapp Hydema to take over representation and that the cancellation was without foundation, and thus just an excuse to change the distributorship. It is claimed that confirmation of the same situation is given in the written witness testimony before the District Court in Seattle, Washington.

**(ii)    Lost sales – 4 POs**

In light of the unjustified cancellation of the Distributorship Agreement, HPSEA demands, in the first place, that they must be indemnified for loss of sales in the form of the four POs which were not honoured. With a mark-up of 1.57 on the sale, this represents a loss of commission revenue of USD 24,655.00.

Interest is demanded according to the Norwegian Act on Overdue Payment.

**(iii)    Outstanding market support payments**

HPSEA demands reimbursement of the outstanding marketing support payments for the months of April, May, June and July 2005, for the total amount of USD 7,811.00.

Interest is demanded on the amount.

**(iv)    Recovery of business expectancy for expected sales**

In addition, HPSEA will demand commission for loss of expected sales in 2008. When considering a compensation payment of this kind, it is natural to start with Scanmar's sales

−20−

through the new representative, Rapp Hydema, presented as Exhibit 1 to Scanmar's Pleading to the Oslo Chamber of Commerce of 19th April 2010.

Based on these figures and assuming a mark-up of 1.57, the loss amounts to USD 63,402.00. In addition a commission or mark-up should be added for sales to Majesty of USD 131,151. The total loss which must under all circumstances be measured under this heading is therefore USD 194,533.

However, HPSEA has made its own estimate of the losses the company has suffered. This is presented as Exhibit 30 in the Cross-Action and amounts to USD 258,574.63.

In brief then, HPSEA believes they should receive an amount of minimum USD 194,553 and maximum USD 258,574.63.

Interest is demanded on the awarded amount.

**(v)      Recovery of business expectancy for expected labour (services)**

HPSEA will also claim for loss of expected income for service work in the period. In support of this, reference is made to the invoices for work sent to Hydra-Pro Dutch Harbor Inc.

Interest is also demanded.

**(vi)      Indemnity claim for HPDH's claims against HPSEA**

HPSEA recognises and respects the Arbitration Court's Award of 25th March 2010, which concludes that Hydra-Pro Dutch Harbor Inc shall not be a part of the arbitration proceedings. However, HPSEA will be liable to Hydra-Pro Dutch Harbor Inc for the losses the company suffers as a result of the unwarranted cancellation of the Distributorship Agreement. The liability that HPSEA has towards the Alaska-based company can therefore be raised as a recourse claim against Scanmar.

HPSEA's demands recovery of the following items:

-      Loss of sales revenue on POs issued in 2007 by Hydra-Pro Dutch Harbor Inc to Scanmar which were not effectuated, totalling USD 135,616.05.

-      Recovery of disbursements made by Hydra-Pro Dutch Harbor Inc in relation to the attendance of the work shop in Hirtshals on 27th October to 2nd November 2007, totalling USD 25,317.45.

-      Loss in business expectancy for repair service (labour) in 2008, of USD 103,916.69.

-      Loss in business expectancy for future sales in 2008, of USD 179,458.20.

In sum, HPSEA is demanding recovery of minimum USD 135,616.05 (lost sales revenue) and maximum USD 444,308.39 (which is the total of all items just listed).

Interest is also demanded.

–21–

**(vii)    Compensation for legal costs prior to the Arbitration**

In the Statement of Claim a statement of costs is presented that have accrued before the arbitration proceedings. Full recovery of these is demanded as the result of the default.

Interest is also demanded.

**(viii)    Compensation for HPSEA's internal cost**

HPSEA in its Statement of Claim has reiterated the demand for recovery of internal costs.

It is argued that these costs could be foreseen and must be reimbursed by Scanmar.

**(ix)    Compensation for all Arbitration costs**

HPSEA demands compensation for the fee charged by the Oslo Chamber of Commerce, expenses in the Arbitration Court, and all own legal costs.

**4.3.    HPSEA's claim**

> *" 1.    SCANMAR'S CLAIMS AGAINST HPSEA*
>
> *With respect to Scanmar's claims:*
>
> *1.    HPSEA shall pay to Scanmar for outstanding debts (invoices) an amount determined by the Court of Arbitration, limited to USD 85,463.00, calculated by the rate current at the invoices due date, within 14 days from the service of the Award, added penalty interest of 9 % per anon starting from the due date until payment is made.*
>
> *2.    HPSEA is acquitted of all claims.*
>
> *3.    HPSEA is acquitted of all claims.*
>
> *4.    HPSEA is acquitted of all claims.*
>
> *5.    HPSEA is acquitted of all claims.*
>
> *6.    HPSEA is acquitted of all claims.*
>
> *7.    HPSEA is acquitted of all claims.*
>
> *8.    HPSEA is acquitted of all claims.*
>
> *9.    HPSEA is acquitted of all claims.*
>
> *2.    HPSEA'S COUNTERCLAIMS IN CROSS-ACTION AGAINST SCANMAR*
>
> *With respect to HPSEA's counter-claims in Cross-Action:*

−22−

1.   HPSEA shall return to Scanmar equipment held in consignment within 14
     days from the service of the Award.

2.   Scanmar shall pay to HPSEA an indemnity for lost sales an amount
     determined by the Court of Arbitration, limited to USD 24,655.00, added the
     penalty interest applicable at any time in accordance with the Norwegian Act
     on Overdue Payments, starting from the due date until payment is made.

3.   Scanmar shall pay to HPSEA as recovery for outstanding marketing support
     payments an amount determined by the Court of Arbitration, limited to USD
     7,811.00, added the penalty interest applicable at any time in accordance with
     the Norwegian Act on Overdue Payments, starting from the due date until
     payment is made.

4.   Scanmar shall pay to HPSEA as recovery of business expectancy for expected
     sales an amount determined by the Court of Arbitration, limited to a minimum
     of USD 194,553.00 and a maximum of USD 258,274.63, added the penalty
     interest applicable at any time in accordance with the Norwegian Act on
     Overdue Payments, starting from the due date until payment is made.

5.   Scanmar shall pay to HPSEA as indemnity for HPSEA's liability against HPDH
     for HPDH's loss an amount determined by the Court of Arbitration, limited to
     a minimum of USD 135,616.05 and a maximum of USD 444,308, added the
     penalty interest applicable at any time in accordance with the Norwegian Act
     on Overdue Payments, starting from the due date until payment is made.

6.   Scanmar shall pay compensation to HPSEA for HPSEA's legal costs prior to
     the Arbitration with an amount determined by the Court of Arbitration within
     14 days from the service of the Award, added the penalty interest applicable
     at any time in accordance with the Norwegian Act on Overdue Payments,
     starting from the due date until payment is made.

7.   Scanmar shall pay all costs, including but not limited to, compensation for the
     fee to Oslo Chamber of Commerce, Court of Arbitration's fees and all of
     HPSEA's legal fees, within 14 days from the service of the Award, added the
     penalty interest applicable at any time in accordance with the Norwegian Act
     on Overdue Payments, starting from the due date until payment is made."

## 5.   ARBITRATION COURT'S VIEWS AND DELIBERATIONS

### 5.1.   Unpaid invoices

The Arbitration Court finds that the Parties concur that goods were delivered from Scanmar
before the cancellation date which remain unpaid for.

Scanmar demands payment of the full invoice amount, USD 104,538, whilst HPSEA believes
a deduction should be made of USD 19,075, resulting in an owing amount of USD 85,463.

The correction items that HPSEA invokes are given in the summary presented as Annex 4 to
the Cross-Action of 3rd May 2010. There are four such correction items:

-23-

- Invoice no. 611301 with correction amount USD 849
- Invoice no. 611330 with correction amount USD 4,611
- Invoice no. 611623 with correction amount USD 1,430, and
- Invoice no. 710026 with correction amount USD 12,263.

The Court finds on the evidence that there is no reason to make the correction on any of the invoices listed.

In so far as concerns the last-mentioned invoice no. 710028, in the amount USD 12,263, the Court finds it proven that this item refers to goods that were dispatched, but not received by Scanmar AS. When we look at the agreed delivery terms, it is clear that HPSEA bears the risk for goods in shipment. The goods in this case are stated to be missing, see information from UPS regarding the matter. The Court finds the matter proven. But since HPSEA bears the risk that the goods arrive safely, no correction should therefore be made regarding this item.

For the three other invoices for which corrections are requested, clarification has been given in the Party Testimonies, and particularly the testimony from Ulf Lundvall. In part, it is a matter of a payment by cheque from HPSEA, which was used as down-payment of the oldest outstanding items. Furthermore, one of the correction items refers to items that were broken, and which the evidence suggests were credited to HPSEA.

Following this the Court has found that Scanmar is upheld in its claim for payment of a total of USD 104,538.

Scanmar has also, under the provisions of the General Conditions of Sales and Delivery, Article 6, a claim for 9 % per annum interest, from the date of each invoice falling due until payment is rendered.

## 5.2.   Stock not returned

The Court finds from the evidence that it has been proven that there was an agreement between the Parties to establish a consignment stock at HPSEA. In this connection reference is made to the acknowledgement by the Respondent, through his attorney in the litigation preliminaries stage (Cross-Action, page 13), that such a consignment stock exists, although this was contested by Mr Ed Ramberg at the Oral Hearing. The invoices presented and the testimonies of the Parties clearly show, however, that the delivered goods were considered to be a consignment stock inter partes.

It follows from general principles of Contractual Obligation Law (Law of Contract), that a party, upon the termination of a consignment stock, or representational alliance, has an obligation to return the goods in his possession on behalf of the manufacturer. This principle can be derived from the Commission Sales Act, section 53, which stipulates that the Principal is the owner of the goods until they are sold, or until the Commissionaire has assumed ownership by stepping in himself. Reference is also made to the general custodial responsibility that is formalised in Christian V's Norwegian Law, section 5-8-17.

Therefore, upon termination of the representational alliance, HPSEA had an obligation to ship the consignment goods back.

-24-

Yet HPSEA has not returned the goods, despite a demand to do so from Scanmar. In Court we were informed that the reason for this was that HPSEA's Norwegian Counsel had advised them to retain the goods, in order to negotiate a settlement. Scanmar therefore invoiced the consignment goods collectively in November 2008 for the amount USD 244,831.

The Court finds that there has clearly been a default on the obligation to return the goods.

In the Court's view, HPSEA cannot in today's situation remedy this default by returning the consignment goods. The evidence must be taken to show that the goods are partially or entirely of no value to Scanmar today. This might have been different if the goods had been returned immediately after the cancellation date on 27th December 2007. It transpired from the Party Testimony by Henning Skjold-Larsen, that Scanmar is in the process of developing an entirely new product line, and they therefore have no benefit from getting these products back into stock in Norway. The Court finds it probable that the goods today have significantly diminished value – if any value at all – to Scanmar. In light of the testimony in Court it must be held to be proven that, on this point, we are faced with an "intentional breach of contract".

The Court finds after this that it can measure out a compensation amount for failure to ship back the consignment goods equal to the invoice sum for the goods.

Accordingly, HPSEA is ordered to pay to Scanmar for unrelinquished stock a total amount of USD 244,831.

The claim was presented in the form of the invoices in November 2008.

Interest will be added of 9 % per annum from the due date on the invoice until payment is rendered.

### 5.3.   Was the cancellation of the Distributorship Agreement lawful?

Paragraphs 5.1 and 5.2 above refer to the payment for goods supplied in the contract period. The other claims and counterclaims raised in this case are by nature compensation claims, and all build on the question of whether the Distributorship Agreement was lawfully cancelled by Scanmar. The Court will therefore proceed with an independent discussion and decision on this issue, before the justification and magnitude of the individual compensation claims is entertained.

At the Oral Hearing, extensive documentation was made of email exchanges between the Parties relating to the ongoing payment of invoices. The Court finds it proven – as has also been acknowledged by HPSEA – that the Respondent was – from fairly early on in the distribution arrangement – considerably in arrears with payment of current invoices, see the submitted email exchange in Annex 3, Subannex 1-43, of the Cross-Action of 3rd May 2010. From the summer of 2007, it seems clear that failure to pay had become a central topic between the Parties. In this connection the Court will refer to the email exchange between the Parties in summer and autumn 2007, presented as Annex 3 and 4 with the Points of Claim. From the email correspondence we quote:

"Mr Ramberg:

> *"First of all I want to apologize for being behind of payment of the account. ... A second issue is your desire to "invoice directly to customers to avoid delay in delivery and fishing". We can understand this position based on our bad payment history."*

*Mr Skjold-Larsen:*

> *"As I understand there has been very little response from your side to pay your outstanding, and the present overdue does not correspond in any way to the sales figures, and there is no question it has to be settled immediately. ... From your mail to Roy Vidar a couple of days ago, I had the clear impression that you had instructed Cliff to settle immediately, so direct invoicing was never a subject in Hirtshals. ...I think you understand that the outstanding has to be settled immediately."*

*Mr Ramberg:*

> *"Hennig, no question, we need to get you money. ... What I can promise, however, is to address the issue when I get back from Australia and find a way of getting you paid in full. ... Roy Vidar is still talking about collection (see e-mail of today). If this is the route you choose to take, please consider this as the termination of our agreement.""*

Scanmar decided to stop deliveries to HPSEA until HPSEA had settled its debt. The Court will refer here to the email from Mr Henning Skjold-Larsen dated 8th November 2007, which says:

> *"It is a fact that we have given you immense support in this building up period, in spite of you not fulfilling your obligations. I therefore am very surprised to your reaction to our claim to have the money you owe us. A bigger problem is what we are going to do in Seattle next week; if you don't settle your debt, we just cannot sell to you. And, if we have to take direct orders, you will not be entitled to any commission. I am sorry, but that is the way it is. Since we don't hear anything to our satisfaction from Cliff, I think this issue need your immediate attention in order to have the show in Seattle running in a smooth way. For many reasons the Hirtshals conference was not what we expected it to be. We can solve that later, but now it is very important that you settle your account with us, having Seattle in mind."*

The Court refers also to the email from Roy Vidar Nilsen to Cliff McKinney of 12th November 2007. From that email the Court quotes:

> *"Hi Cliff,*
> *As we have said we will continue the preparation for taking legal steps for full collection of outstanding including interest and loss for currency exchange by Wednesday this week. Then there will also be fee for collection agency in addition. I therefore recommend you to seek solution to the big problem (how to pay us within the timeframe) rather than using time for the match between payment and invoices and credit notes. For the time being, use my open list from the mail earlier today, even if there is a couple of 100 dollar difference."*

Despite the direct encouragements that appear in the above-cited email correspondence, the outstanding debt was not paid up by HPSEA.

Scanmar commissioned the collection agents *KrediNor* in autumn 2007 to claim the debt on Scanmar's behalf. KrediNor wrote to HPSEA on 16th November 2007. From the introduction to the letter, we cite:

> "*Debt collection*
> *This is a request for immediate payment of the item below, which has been placed with us by the creditor. If we have not received your payment within 14 days, we may be instructed by the creditor to proceed against you through our associates in your country. If you are not able to settle the amount in full, please contact our office to arrange payment in instalments.*"

Following the evidence that has been presented the Arbitration Court must clearly find that HPSEA was in payment default in the months of November-December 2007. In the Court's view, this payment default was material, in that the payments had been in default for an long period, and the amounts were significant. The default basically gives Scanmar grounds to cancel the Agreement, not simply under the conditions of the contract, but also under general rules of Contractual Obligation Law .

The question that arises however is whether any special deal was made regarding a repayment plan which would set the general cancellation right to one side. This Court cannot see from the evidence that the Respondents have documented that any such accord was framed between the Parties relating to repayment.

The Court builds this view in part on the email correspondence that has been documented in Court and the Party Testimonies submitted.

The Court refers in particular to the email correspondence between Roy Vidar Nilsen and Cliff McKinney on 6th November 2007. From Cliff McKinney's email the Court will quote:

> "*I apologize for not getting back to you sooner.*
>
> *You were right when you suggested our new accounting system could be causing problems. It is. I have been going through hell.*
>
> *However I should have done something to get our account straightened out.*
>
> *I have compared our list of open invoices to Scanmar with the list you sent us ($232,561). I agree with $173,441. I would like to write you a check for this amount immediately. Unfortunately I don't have the cash. Ed has instructed me to start paying this balance immediately. On the attached spreadsheet I have outlined a monthly schedule which will pay off the balance in six (6) months. If it is acceptable to you, I will send you the first $37,172 payment this week. Balance of payments will be sent as indicated on the "Agree Items" worksheet.*
>
> *Can you accept these payment terms?*"

As will be understood, a repayment plan over six months is suggested for the outstanding claims. The suggestion for a repayment plan was expressly rejected by Scanmar, care of

-27-

Roy Vidar Nilsen, by email on the same day, at 7:35 a.m. The Court will cite from the said email:

> "Hello Cliff,
> We are surprised to your suggested payment plan, when there have been several informal agreements to pay the due debt, with only minor payment. By this reason we will fulfill action as stated in my e-mail last week, we will have to take legal actions if we don't have full payment of outstanding including interest for late payment within 14 days (next Wednesday). We will also claim the loss we have had, due to substantial change in exchange rate between US$ and NOK kroner in the period."

It is also apparent in a summary of the process from KrediNor, presented as Annex 10 with the Points of Claim of 8th December 2009, from Scanmar, that HPSEA has asked for six months repayment time, but that the creditor has rejected that. The Court cites from the KrediNor report:

> "15.11.2007 sst
> ... Creditor has sent in the credit-notice himself. Debtor has no objection to the claim, but procrastinated for a very long time. Has asked for repayment over six months, but Creditor will not accept. Creditor has informed unequivocally that the claim will now proceed to collection."

There is further contact between KrediNor and HPSEA on 17th December 2007. We quote:

> "17.12.2007 heb
> Telephone from Creditor. Asks that we call Debtor and get back to them with a report on the result. Debtor has a desire to pay the claim over six months, but Creditor will not accept that. ..."

The above shows, the Court feels, that HPSEA has suggested a repayment plan, but it has not been accepted by Scanmar. This is supported also by the Party Testimonies given in Court.

For its part, HPSEA has failed to submit any written documentation to support the idea that they had reached an accord with Scanmar about a payment plan.

The Court has found, following the above, that there exists a material payment default by HPSEA – a default that has not been remedied by any special repayment accord.

The Court finds after this that Scanmar was justified in cancelling the Distributorship Agreement on 27th December 2007.

The Court sees fit to emphasise that the email exchange presented, whereby it might seem as if Scanmar, prior to cancellation, was looking for a new representative in Rapp Hydema, does not alter the finding. It is not unnatural – and nor is it illegal – for one party in a situation of default by a cosignatory – to think through the alternatives that the company faces with regard to alternative representation and implementation of sales activities, in the event that the payment default is not remedied, and cancellation follows. Reference is made in this connection to the Distributorship Agreement, Paragraph 1.2, final paragraph.

–28–

Following the result that the Arbitration Court has arrived at above, HPSEA has not succeeded in any of the claims that were filed for compensation in the Cross-Action of 3rd May 2010. In so far as regards the claim for payment for marketing support, this is dealt with specifically below.

The Arbitration Court will now move to a discussion of the compensation claims that have been filed by Scanmar.

### 5.4.    Loss on exchange rate

The existing Distributorship Agreement stipulates that payment between the Parties shall be made in Euros. By mutual understanding between the Parties it was decided to change that and invoice in US dollars. Both Parties must be said to have accepted US dollars as the settlement currency by the fact of their implementation of it, and neither of them have disputed this arrangement.

The exchange rate of Norwegian kroner and US dollars has changed since the due date of the invoices until the time of the Oral Hearing. Scanmar has demanded recovery of this loss.

The liability for the loss item as a result of the default of a payment obligation does not rest on the culpability of the debtor. It is sufficient that there is a payment default that has caused the cancellation of the contract.

Compensation for exchange rate losses follows from the principle in the Promissory Note Act (in Norwegian "*Gjeldsbrevloven*"), section 7, second paragraph. The provision is not directly applicable, since it deals with obligations for a promissory note, but we can assume in theory and in practice that it is an expression of a general principle of Contractual Obligation, whereby the creditor is entitled to compensation if the payment demand is denominated in one currency, which has fallen in value in relation to the currency at the payment venue, in the interval between due date and payment. The Arbitration Court finds that the exchange rate loss is a predictable loss that results from the default.

Scanmar has filed a claim for compensation at the Court's discretion, limited to a maximum of USD 62,252. This amount is rooted in a calculation dated 8th December 2009, see Points of Claim, Exhibit 43. On the other hand, at the Oral Hearing, a calculation was presented as of the date of the Oral Hearing, which amounts to USD 9,920 with reference to outstanding debts and USD 13,491 with reference to the invoice sum for unreturned consignment goods. The Court finds it appropriate to measure the damage compensation with reference to the change in the exchange rate in accordance with the later loss summary. It sets out what constitutes the actual loss to Scanmar.

Following this, HPSEA is ordered to pay USD 23,411 to Scanmar to cover the company's exchange rate losses. The loss arises at the time of the judgement, and there is no authorisation to impose interest rate compensation on the amount.

### 5.5.    Scanmar's claim for indemnity for lost sales "13 taken POs"

Scanmar is claiming for losses arising from failure to implement sales with reference to twelve Purchase Orders (originally 13) from HPSEA.

−29−

The first four Purchase Orders are numbered 001524, 001529, 001541 and 001542 and were forwarded by HPSEA on 24th and 25th October 2007. When effectuation was refused by Scanmar, they were sent again, this time through the company Hydra-Pro Dutch Harbor Inc in December 2007. Again, the POs were not effectuated.

The Purchase Orders are detailed below:

| PO Date | PO No. | Vessel | Item | Order Qty | Distr. net price | | Total | |
|---------|--------|--------|------|-----------|------------------|--|-------|--|
| 24.10.2007 | 001524 | **Constellation** | QBC-05 | 2 | € | 618 | € | 1 236 |
| | | | SS4-MV | 2 | € | 7 673 | € | 15 346 |
| 25.10.2007 | 001541 | **Cape Horn** | GRID | 1 | € | 7 543 | € | 7 543 |
| | | | Mount.kit | 1 | € | 1 021 | € | 1 021 |
| | 001542 | **US Intrepid** | SS4-DTV | 1 | € | 10 071 | € | 10 071 |
| | 001529 | **Seafisher** | ANGLE | 1 | € | 8 691 | € | 8 691 |
| **Grand Total** | | | | | | | € | 43 908 |

Scanmar has contended that they later managed to secure PO 001529, Seafisher, after which the amount has been reduced to € 35,214.

The other nine Purchase Orders from HPSEA, which were not effectuated, concern the following POs: Legacy dated 1st November 2007, Seafreeze Alaska dated 1st November 2007, D-19896, D-19892, D-19884, D-19891, D-19936, D-19937 and D-19938.

The ships in question and the invoice amounts are presented in what follows:

| PO Date | PO No. | Vessel | Item | Order Qty | Distr. net price | | Total | |
|---------|--------|--------|------|-----------|------------------|--|-------|--|
| 30.10.2007 | D-19877 | **Legacy** | Doorpock-A | 1 | € | 913 | € | 913 |
| | | | Doorpock-M | 1 | € | 816 | € | 816 |
| | | | HC4-A110 | 1 | € | 7 917 | € | 7 917 |
| | | | Hydroph. | 1 | € | 1 863 | € | 1 863 |
| | | | MTR-110 | 1 | € | 1 952 | € | 1 952 |
| | | | QBC-05 | 2 | € | 618 | € | 1 236 |
| | | | | | | | | |
| 31.10.2007 | D-19877 | **1. Seafreeze Alaska** | Angle-D | 1 | € | 14 031 | € | 14 031 |
| | | | Lic-A | 2 | € | 2 877 | € | 5 754 |
| | | | QBC-X1 | 2 | € | 1 532 | € | 3 064 |
| | | | SS4V-C | 2 | € | 4 796 | € | 9 592 |
| | | | | | | | | |
| 9.11.2007 | D-19891 | **Rebecca Irene** | 103959 GS | 1 | € | 6 523 | € | 6 523 |
| | | | GRID | 1 | € | 7 543 | € | 7 543 |
| | | | Lic-A | 2 | € | 2 877 | € | 5 754 |
| | | | QBC-05 | 2 | € | 618 | € | 1 236 |
| | | | QBC-X1 | 2 | € | 1 532 | € | 3 064 |
| | | | SS4V-C | 2 | € | 4 796 | € | 9 592 |
| | | | | | | | | |
| | D-19892 | **Defender** | TEY-Batt | 1 | € | 1 535 | € | 1 535 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | GRID | 1 | € | 7 543 | € | 7 543 |
| | | | QBC-05 | 1 | € | 618 | € | 618 |
| | D-19893 | Ocean Peace | BOTTOM | 1 | € | 9 605 | € | 9 605 |
| | | | GRID | 1 | € | 7 543 | € | 7 543 |
| | | | Lic-A | 1 | € | 2 877 | € | 2 877 |
| | | | QBC-05 | 1 | € | 618 | € | 618 |
| | | | Qbc-X1 | 1 | € | 1 532 | € | 1 532 |
| | | | SS4V-C | 1 | € | 4 796 | € | 4 796 |
| | | | Upgrade 60 | 2 | € | 4 426 | € | 8 852 |
| | D-19894 | Stock | Doorpock-A | 1 | € | 913 | € | 913 |
| | | | Doorpock-M | 1 | € | 816 | € | 816 |
| | | | HC4-A110 | 1 | € | 7 917 | € | 7 917 |
| | | | MTR-110 | 1 | € | 1 952 | € | 1 952 |
| 9.12.2007 | D-19936 | Arica | GRID | 1 | € | 7 543 | € | 7 543 |
| | | | QBC-05 | 1 | € | 618 | € | 618 |
| | D-19937 | Enterprise | QBC-05 | 1 | € | 618 | € | 618 |
| | | | GRID | 1 | € | 7 543 | € | 7 543 |
| | D-19938 | Unimak | BOTTOM | 1 | € | 9 605 | € | 9 605 |
| | | | GRID | 1 | € | 7 543 | € | 7 543 |
| | | | QBC-05 | 1 | € | 618 | € | 618 |
| **Grand Total** | | | | | | | € | 172 055 |

In the pre-trial hearings Scanmar stated that the gross margin was 70 % – which has been amended to 80 % in the Oral Hearing. Scanmar does not demand a specific amount, but leaves it to the Court's discretion to determine a possible sum.

The Court finds it proven that Scanmar had made the preparations for, and made an effort to ensure the implementation of, the potential sales that the Purchase Orders from HPSEA reflected. The Court refers to the fact that Tim Tilleman, in his declaration to the United States District Court in Seattle, Washington, Exhibit 2 to the Pleading from HPSEA of 26th February 2010, stated that Scanmar had established contact directly with customers at a Flume Tank Seminar in Hirtshals, Denmark, on 28th October to 1st November 2007. Tilleman testified to the US Court that there was direct contact between Scanmar and representatives for Ocean Peace. Furthermore, the Arbitration Court refers to Scanmar's own arguments, see their Pleading of 25th May 2010, Paragraph 1.4.1, from which we cite:

> "After termination of the Agreement, Scanmar contacted companies who had been present in Hirtshals and gave them an opportunity to buy equipment at prices offered in Hirtshals. This was irrespective of if they had been referred to in the respective POs of concern in this case.
>
> The fishing fleet in Seattle leaves port January each year. Since Scanmar was not made aware of the POs according to the Agreement, the necessary installation work could not be made in Seattle prior to the fleet leaving. Thus, Scanmar was forced to

> *take on extra costs and effort to secure orders when the fleet arrived in Dutch Harbor."* (Court's underline)

It is apparent here, that, even though the fishery fleet had left Seattle at the commencement of the "A" season in January 2008, customers were still contacted directly upon arrival in Dutch Harbor, Alaska. Reference is also made to the email exchange referred to above in January and February, from Scanmar, directly to the respective customers. Additionally the Court refers to the fact that Scanmar, on 20th December 2007, had received a response to its request for full identification of the ship names and other details, with reference to the individually identified Purchase Orders.

The Court finds after this that it is probable that at least a part of the Purchase Orders for which compensation is claimed had been implemented by sales directly to the customers. The presented invoices from Scanmar directly to the customers, correlated with the originally issued Purchase Orders from HPSEA, coincide for some of the products. It is true that in Court there was testimony that some of the products had been developed with additional installations and suchlike. However, this does not change the Court's view that some of the sales were secured.

A comparison of the original Purchase Orders and sales, however, shows that they do not always match up. It is found from the evidence that it has been shown, that at least some of the customer orders reflected in the HPSEA POs did not result in later sales from Scanmar or Rapp Hydema, after termination of the representational relationship with HPSEA. The Court finds that a loss of earnings should be estimated on the basis of the lost sales.

The compensation liability builds on the conclusion that the Court has arrived at above, namely that there exists a default on payment obligations, which brought about a cancellation of the representational relationship. The cause of the payment default is not relevant, since lack of liquidity under Norwegian law does not release from liability.

As for the size of the loss, the Court finds, as already noted, that a major part of the orders were secured by later sales. The Court also finds it proven – in part through the Party Testimonies of Henning Skjold-Larsen and General Manager Ulf Lundvall, that the gross margin is something of the order of 70-80 %.

The Court finds it appropriate to make a collective and discretionary evaluation of the net loss that Scanmar has suffered as a result of lack of sales on the Purchase Orders. This net loss may be appropriately stipulated at € 75,000.

It should be remarked that the claim by the Plaintiff is made in Euros, since we are told that the Parties reverted to the Distributorship Agreement's currency after the unfavourable slide of the dollar with respect to the Norwegian kroner and Euro. HPSEA has not objected to the presentation of the claim in Euros, and this is therefore adopted by the Court.

The claim was presented in the Points of Claim of 8th December 2009, and interest is awarded from 7th January 2010 at the rate applicable at any time according to the Norwegian Act on Overdue Payments.

### 5.6. Demand for recovery of further losses prior to termination -- breach of marketing obligations

In the Distributorship Agreement of November 2004, special provisions were included that aimed to ensure that HPSEA undertook active marketing efforts within the Territory. As an exhibit with the Distributorship Agreement there is a specific catalogue of what market activities the company is to supply and what specific reporting and budgeting routines should be observed. In this connection we refer to the special catalogue which was given under the presentation of the factual background in Paragraph 2 above.

It is clear that Scanmar during 2007 expressed dissatisfaction with the manner in which market support was being performed, see, among other things, the email exchange between Henning Skjold-Larsen and Ed Ramberg, as documented in Court. However, it must also be said to be proven that HPSEA, for its part, undertook a range of marketing support measures, for example direct contact with customers by visiting their boats, participating in fairs, seminars, and more.

In the Court's view it is not necessary to make a detailed exploration or conclusion regarding how much the discrepancies identified regarding routines for marketing support can be called a material default of the contract. This is because the Court finds that Scanmar has not sufficiently proven that there arose any financial loss to Scanmar in 2007 that derived from inadequate marketing efforts. There is no concrete documentation, and the evidence builds in the main on the Party Testimony by the Scanmar representative. No connection has been shown between the concrete losses in sales or otherwise that might help prove that a loss was suffered by Scanmar.

Scanmar has the burden of proof for the alleged loss. Such loss has not been proven, and HPSEA must be acquitted for the demand for compensation based on inadequate marketing support in 2007. Inadequate marketing support will however, the Court feels, have a direct impact on the claim submitted by HPSEA, which references the invoices to Scanmar, ostensibly for marketing support. This will be dealt with below.

### 5.7. Claims for compensation for loss after termination – future sales

The Arbitration Court has found grounds to award Scanmar a discretionary amount in compensation with reference to the losses in the 2008 earnings year.

As a result of the payment default, the contract was cancelled. This has meant that Scanmar – as a direct consequence of the payment default and cancellation of the Distributorship Agreement -- was without a local representative in the Territory until autumn 2008, when Rapp Hydema stepped in. It has been explained how the company in the interim period had itself made contact with the market, but had a storage contract with Dan Trawl.

Information has been presented in Court about the development of sales of Scanmar products within the Territory for the years from 2006 until 2008, inclusive. The figures for 2008 show roughly the same sales as in 2007. Based on the Party Testimonies and documentation of accounting details in the Oral Hearing, this Court finds that it is probable that stagnation in sales must in part be due to Scanmar being left without a local representative in the Territory until Rapp Hydema took over the sales activities in autumn 2008. The Arbitration Court finds it unlikely, however, that the reversal in sales is as large as claimed by Scanmar in its summarising pleading of 25th May 2009 (MNOK 2.4). In this

−33−

regard, the Court refers to the fact that Scanmar's party representative at the Oral Hearing testified that 2009 was sometimes at the same level as 2008, and that 2010 would be a poor year, which was due to the upcoming introduction of a new product line in 2011.

The Court finds – as explained above – that the profit margin was in the order of 70-80 %.

Based on the above the Court finds that the net loss in earnings for Scanmar for the earnings year 2008 can suitably be estimated at NOK 700,000 and interest is awarded from 7th January 2010 at the penalty interest rate that applies in accordance with the Norwegian Act on Overdue Payments.

The demand for the compensation amount is denominated in Norwegian kroner. The opposing Party has not objected to this currency and the compensation amount is therefore stipulated in Norwegian currency.

### 5.8.    Scanmar's legal cost prior to the Arbitration

The Plaintiff has demanded recovery of costs for legal assistance prior to the submission of the complaint to the Arbitration Court. The amount is NOK 55,450.

As the Court has concluded above, there exists a payment default that is the source of the cancellation of the contractual relationship. The lack of liquidity, as a basis for payment default, is not something that releases from liability under Norwegian law, and therefore there exists a liability basis.

The Court considers the costs were necessary and predictable based on the default situation which existed, so HPSEA is ordered therefore to pay the costs to Scanmar, and interest is awarded from 7th January 2010 at the penalty interest rate that applies from time to time under the Norwegian Act on Overdue Payments.

### 5.9.    HPSEA's invoices for marketing support

HPSEA is demanding recovery of its outstanding marketing support payments for the months April, May, June and July 2005, for a total amount of USD 7,811.00.

The Court will refer to the discussion above where the evidence shows that HPSEA on several counts has failed to meet the obligations that they had in regard to marketing support for Scanmar's products within the Territory. The Court found no evidence of economic loss, but finds that by defaulting on its obligations, we must find that HPSEA has forfeited its claim for payment for services that were not satisfactorily delivered.

The Court finds accordingly that it is not necessary to take a stand on the question of whether the invoices refer in part to work performed by Ed Woods or not, or whether the claim is statue-barred.

Therefore HPSEA is not upheld in its claim for payment of the marketing support invoices.

–34–

## 6.   LEGAL COSTS AND ARBITRATION COURT FEE

Scanmar has asked the Arbitration Court to order HPSEA to cover Scanmar's legal costs in the Main Action and Cross-Action, see the Arbitration Act, section 40, second paragraph. Scanmar has essentially been upheld in both actions and the Arbitration Court finds for that reason that HPSEA should cover Scanmar's legal costs.

Although it was not decisive for the legal costs issue, this Arbitration Court will remark that HPSEA has not contributed in the way they should have to resolve this dispute in a smooth manner, and has in many respects confounded the progress in the case, for instance by bringing in Hydra-Pro Dutch Harbor and bringing in the uncertainties of filing for Chapter 7 or Chapter 11 on the eve of the Main Action. Furthermore it is this Arbitration Court's view that further confusion was caused by introducing the suggestion that the consignment goods are in transit to Norway. The Court further finds that the lack of commitment to the fast-track arbitration process and resolution of the case out of court has resulted in an expensive regular arbitration process in the Oslo Chamber of Commerce.

The legal costs claim is not divided between the Main Action and Cross-Action, and indeed the Court finds it unnecessary to do so, since Scanmar has been upheld in both actions. Therefore a combined award is given in so far as regards the legal costs for the two actions.

Attorney Fredny Bade has submitted a cost schedule amounting in total to NOK 1,700,107.80. This amount includes the outlay for the Oslo Chamber of Commerce, in the amount NOK 25,000. The Court notes in this connection that the matter has been extremely comprehensive, with a large number of documents, for instance extensive email correspondence, invoices, Purchase Orders, accounting records and various print-outs of legal proceedings in Seattle, etc. The case has been relatively complex in the sense that a range of claims and counterclaims have been raised between the Parties, with different factual and legal bases for them. The case has also been frustrated since the Respondent's counsel has pulled out, so that much of the burden of elucidating the case to this Court has fallen on the Plaintiff's counsel. The Oral Hearing was held with the Court convened from 9.00 in the morning until 18:15, 21:00 and 18:00 hours, respectively, on each day.

The Plaintiff's Legal Costs Schedule is adopted here for the Arbitration Court's decision and HPSEA is ordered to pay the amount.

It is found that Scanmar engages in sales that are subject to value added tax, and can therefore deduct any input VAT. The awarded legal costs will not therefore carry VAT.

The Arbitration Court has stipulated its fee as NOK 750,000 plus VAT.

The Arbitration Court finds in light of the outcome of this case that HPSEA must recover the full expenses of the Arbitration Court, see Arbitration Act, Section 40, first paragraph, and also the rules of the Arbitration and Dispute Resolution Institute of the Oslo Chamber of Commerce, Article 20.

The Arbitration Court defines its work as occupational income. Even where the Respondents are non-resident companies, VAT will still be payable since fees for court processing are not deemed a remote delivery of services, and are therefore vatable in Norway. See *Marianne Scheel, Norsk merverdiavgift ved internasjonal handel* (Norwegian VAT for International Trade), second edition, page 91, which refers to the Directorate of Taxes' letter of 29th May

–35–

2002 to the Norwegian Bar Association, and the Ministry of Finance's letter to the Directorate of Taxes of 14th May 2002.

The Arbitration Court's fee falls due for payment one (1) month after the judgement is pronounced, see the Arbitration Act, section 39. The Parties are jointly and severally liable for the costs. The technical details of the settlement and reconciliation will be announced separately.

The Arbitration Court finds moreover that HPSEA, in light of the outcome of the case, must cover the fee for the Arbitration and Dispute Resolution Institute of the Oslo Chamber of Commerce, see the rules of the Institute, Article 20, third paragraph. The standard fee of NOK 25,000 has been prepaid by the Plaintiff and is included in the awarded legal costs, see the Legal Costs Schedule presented by the Plaintiff. For that reason no independent judgement is pronounced for the standard fee. The surcharge to the Oslo Chamber of Commerce amounts to NOK 5,100 plus VAT, which HPSEA is ordered to pay.

The Arbitration Court following the above delivers the following:

**AWARD:**

**In the Main Action:**

1.    Hydra-Pro, Inc. shall pay to Scanmar for outstanding debts (invoices) USD 104,538, - USD onehundredandfourthousandfivehundredandthirtyeight - calculated by the exchange rate current at the invoices' due date, or the equivalent amount in EUR within 14 days from the service of the Award, added penalty interest of 9 % per anno starting from the due date of the invoices until payment is made.

2.    Hydra-Pro, Inc. shall pay to Scanmar for stock not returned USD 244,831, - USD twohundredandfourtyfourthousandeighthundredandthirthyone - calculated by the exchange rate current at the invoice's due date, or the equivalent amount in EUR, within 14 days from the service of the Award, added penalty interest of 9 % per anno starting from the due date of the invoice until payment is made.

3.    Hydra-Pro, Inc. shall pay to Scanmar indemnity for loss on exchange rate USD 23,411, - USD twentythreethousandfourhundredandeleven 14 days from the service of the Award plus interest applicable at any time, in accordance with the Norwegian Act on Overdue Payments from due date until payment is made.

4.    Hydra-Pro, Inc. shall pay to Scanmar indemnity for additional losses € 75,000 – Euro seventyfivethousand – and NOK 755,450 – NOK sevenhundredandfiftyfivethousand-fourhundredandfifty - within 14 days from the service of the Award, added the penalty interest applicable at any time, in accordance with the Norwegian Act on Overdue Payments starting 7 January 2010 until payment is made.

**In the Cross-Action:**

1.    Hydra-Pro, Inc. is denied the right to return to Scanmar equipment held in consignment as an alternative to paying indemnity for the invoice related thereto.

−36−

2.    Scanmar is acquitted of all other counterclaims.

**In the Main Action and Cross-Action:**

1.    Hydra-Pro, Inc are ordered within 2 – two – weeks from the notification of this
      decision to pay legal cost to Scanmar AS in the amount of NOK 1,700,107.80 – NOK
      onemillionsevenhundredthousandonehundredandseven 80/100 plus interest
      applicable at any time, in accordance with the Norwegian Act on Overdue Payments
      from due date until payment is made.

2.    Hydra-Pro, Inc are ordered to pay the Court of Arbitration's cost of NOK 750.000 –
      NOK sevenhundredandfiftythousand plus VAT plus the Norwegian Legal Penalty
      interest applicable at any time from due date until such time as payment is rendered.
      The amounts fall due for payment 1 – one – month after pronouncement of the
      judgement.

3.    Hydra-Pro, Inc are ordered to pay to the Oslo Chamber of Commerce their additional
      costs of NOK 5,100 – NOK fivethousandonehundred – plus VAT. The amounts fall
      due for payment 1 – one – month after pronouncement of the judgement.

Oslo, 8th July 2010

Gunnar Stake-Larsen
Arbitrator

# EXHIBIT "C"

# STEENSTRUP STORDRANGE

Hydra Pro Inc
4259 22nd Avenue W
Seattle, WA 98199
USA

Oslo, 15 July 2010
Ref.: 898343.1-102904  PREANN/SPAELF
Attorney in charge: Fredny Bade

REGISTRATED LETTER
This letter is also sent by e-mail to the following
recipients: edramberg@hydrapro.com
clifflmckinney@hydrapro.com

**REQUEST FOR PAYMENT – ARBITRATION CASE SCANMAR AS- HYDRA PRO INC**

Reference is made to the July 8 2010 Award from the Arbitration Court of Oslo Chamber of
Commerce.

In accordance with the Award delivered therein, we hereby request Hydra Pro Inc. to pay the
following amounts to Scanmar within July 22 2010:

| Action/Award | Principal amount | Interest | Sum |
|---|---|---|---|
| Main-Action: | | | |
| Award # 1 | USD 104,538 | USD 31,636 | USD 136,174 |
| Award # 2 | USD 244,831 | USD 36,101 | USD 280,932 |
| Award # 3 | USD 23,411 | - | USD 23,411 |
| Award # 4 | EUR 75,000 | EUR 3,534 | EUR 78,534 |
| | NOK 755,450 | NOK 35,605 | NOK 791,055 |
| | | | |
| Main-Action and Cross-Action: | | | |
| Award # 1 | NOK 1,700,107.80 | - | NOK 1,700,107.80 |

Total to be paid by July 22 2010:
**USD:  440,517**
**EUR:  78,534**
**NOK:  2,491,163**

We should emphasize that the amounts specified above does not include any interest
beyond what has been ordered by the Arbitration Court. For your information, please find the
interest calculations enclosed.

Please note that the amounts set out above are including penalty interest up to July 22
2010. Hence, should payment not be made within July 22 2010, further interest will accrue
until payment is rendered in full.

We should also inform that Scanmar will initiate recovery procedures should the amounts set
out above not be paid within July 22 2010. Should recovery procedures be necessary, Hydra
Pro Inc will be held liable for any and all costs related thereto.

| Advokatfirmaet Steenstrup Stordrange DA | Phone +47 22 81 45 00 | Org.nr: | www.steenstrup.no |
| P.O.Box 1829 Vika, N-0123 Oslo | Fax +47 22 81 45 01 | NO 960 716 647 MVA | lawyers@steenstrup.no |
| Haakon VIIs gate 5, Oslo | | | |

Please make out the payment to Scanmar AS' US account:

Acc.no. : 8396.04.54130
IBAN no: NO4583960454130
SWIFT code: HANDNOKK
Bank          : Handelsbanken AS
Adress        : Postboks 510
                3101 TØNSBERG;  NORWAY

Please have your bank send Scanmar a written confirmation by e-mail
henningsl@scanmar.no and ulfl@scanmar.no,  as soon as the payment has been made.

We look forward to be hearing from you, please confirm receipt of this letter.


Yours sincerely,
Advokatfirmaet Steenstrup Stordrange DA


Fredny Bade
Attorney


Enclosure

ENCLOSURE 1

## Interest for account 10035 Hydra-Pro Inc.

Date :        22.07.2010

| Invoice date | Invoice decription | Currency | Orginal amount | Rest amount | Due date | Days after due date | Interest for due period |
|---|---|---|---|---|---|---|---|
| 31.07.2006 | 611301 Ordre SMO6-2084 | USD | 6 613 | 2 692 | 30.08.2006 | 1422 | 944 |
| 01.08.2006 | 634242 Support march 2005( dis | USD | 3 125 | 3 125 | 01.08.2006 | 1451 | 1 118 |
| 04.08.2006 | 611330 Ordre SMO6-2083 | USD | 46 014 | 18 517 | 03.09.2006 | 1418 | 6 474 |
| 15.09.2006 | 611623 Ordre SMO6-2372 | USD | 2 388 | 1 430 | 15.10.2006 | 1376 | 485 |
| 04.12.2006 | 634373 Overført Utlan | USD | 192 | 192 | 04.12.2006 | 1326 | 63 |
| 02.01.2007 | 710001 Ordre SMO6-2968 | USD | 6 111 | 6 111 | 01.02.2007 | 1267 | 1 909 |
| 02.01.2007 | 710002 Ordre SMO7-1001 | USD | 49 | 49 | 01.02.2007 | 1267 | 15 |
| 02.01.2007 | 710003 Ordre SMO7-1000 | USD | 3 312 | 3 312 | 01.02.2007 | 1267 | 1 035 |
| 02.01.2007 | 710004 Ordre SMO6-2956 | USD | 1 485 | 1 485 | 01.02.2007 | 1267 | 464 |
| 09.01.2007 | 710028 Ordre SMO7-1034 | USD | 12 263 | 12 263 | 08.02.2007 | 1260 | 3 810 |
| 09.01.2007 | 710028 Ordre SMO7-1026 | USD | 11 869 | 11 869 | 08.02.2007 | 1260 | 3 688 |
| 15.01.2007 | 710079 Ordre SMO7-1043 | USD | 724 | 724 | 14.02.2007 | 1254 | 224 |
| 05.02.2007 | 710221 Ordre SMO7-1214 | USD | 1 243 | 1 243 | 07.03.2007 | 1233 | 378 |
| 25.04.2007 | 710771 Ordre SMO7-1547 | USD | 226 | 226 | 25.05.2007 | 1154 | 64 |
| 07.05.2007 | 710853 Ordre SMO7-1802 | USD | 2 342 | 2 342 | 06.06.2007 | 1142 | 659 |
| 07.05.2007 | 710854 Ordre SMO7-1815 | USD | 2 342 | 2 342 | 06.06.2007 | 1142 | 659 |
| 07.05.2007 | 710855 Ordre SMO7-1801 | USD | 1 484 | 1 484 | 06.06.2007 | 1142 | 418 |
| 07.05.2007 | 710861 Ordre SMO7-1818 | USD | 5 100 | 5 100 | 06.06.2007 | 1142 | 1 436 |
| 24.05.2007 | 710987 Ordre SMO7-1817 | USD | 3 943 | 3 943 | 23.06.2007 | 1125 | 1 094 |
| 22.06.2007 | 711161 Ordre SMO7-2077 | USD | 10 083 | 10 083 | 22.07.2007 | 1096 | 2 725 |
| 26.06.2007 | 711176 Ordre SMO7-2085 | USD | 2 061 | 2 061 | 26.07.2007 | 1092 | 555 |
| 02.10.2007 | 711645 Ordre SMO7-2495 | USD | 11 843 | 11 843 | 01.11.2007 | 994 | 2 903 |
| 05.10.2007 | 711661 Ordre SMO7-2512 | USD | 2 342 | 2 342 | 04.11.2007 | 991 | 572 |
| 12.12.2007 | 734384 Hydra - Pro, Inc | USD | -   32 402 - | 240 | 12.12.2007 | 953 | -   56 |

**Totals up to July 22nd 2010**                      **104 538**              **31 636**

ENCLOSURE 2

## Interest for account 10035 Hydra-Pro Inc.

Date :        22.07.2010

| Invoice date | Invoice # | decription | Currency | Orginal amount | Rest amount | Due date | Days after due date | Interest for due period |
|---|---|---|---|---|---|---|---|---|
| 21.11.2008 | 811669 | Ordre SMO8-2540 | USD | 244 831 | 244 831 | 01.12.2008 | 598 | 36 101 |
| **Totals up to July 22nd 2010** | | | | | 244 831 | | | 36 101 |

ENCLOSURE 3

## Currency loss for account 10035 Hydra-Pro Inc.

Date :            22.07.2010

| Date | Invoice # | decription | Currency | Orginal amount | Rest amount | Due date | Days after due date | Interest for due period |
|------|-----------|------------|----------|----------------|-------------|----------|---------------------|-------------------------|
| 08.07.2010 | 811669 | Loss on Exchange rate | USD | 23 411 | 23 411 | 22.07.2010 | 0 | - |

**Totals up to July 22nd 2010**                                                        23 411                                                        -

**ENCLOSURE** 4

## Indemnty account 10035 Hydra-Pro Inc.

Date :     22.07.2010

| Date | | decription | Currency | Orginal amount | Rest amount | Due date | interst rate | Days after due date | Interest for due period |
|------|------|-----------|----------|---------------|-------------|----------|-------------|---------------------|------------------------|
| 08.07.2010 | 30.06.2010 | Indemnty | EUR | 75 000 | 75 000 | 07.01.2010 | 8,75 % | 175 | 3 146 |
| 08.07.2010 | 01.07.2010 | | | | | | 9,00 % | 21 | 388 |
| **Totals EURO up to July 22nd 2010** | | | | | | - | | | 3 534 |
| | | | | | | | | | |
| 08.07.2010 | 30.06.2010 | Indemnty | NOK | 755 450 | 755 450 | 07.01.2010 | 8,75 % | 175 | 31 693 |
| 08.07.2010 | 01.07.2010 | | | | | | 9,00 % | 21 | 3 912 |
| **Totals NOK up to July 22nd 2010** | | | | | | - | | | 35 605 |

**ENCLOSURE 5**

| In he main action | | | interest | USD | EURO | NOK |
|---|---|---|---|---|---|---|
| Award # 1 | USD | 104 538 | 31 636,00 | 136 174,00 | | |
| Award # 2 | USD | 244 831 | 36 101,00 | 280 932,00 | | |
| Award # 3 | USD | 23 411 | - | 23 411,00 | | |
| Award # 4 | EURO | 75 000 | 3 534,00 | | 78 534,00 | |
| | NOK | 755 450 | 35 605,00 | | | 791 055,00 |

| in he main action and cross action | | | | | | |
|---|---|---|---|---|---|---|
| Award # 1 | NOK | 1 700 107,80 | | | | 1 700 107,80 |

| Total to be paid | | | | 440 517 | 78 534 | 2 491 163 |
|---|---|---|---|---|---|---|